# TAYLOR

*v.*

# THE UNITED STATES.

---

CRIMINAL LAW; EVIDENCE; DECLARATIONS; EXPERT TESTIMONY;
INSANITY.

1. It is not error in a murder case, in which the defence of insanity is set up, for the trial court to refuse to allow testimony to be introduced on behalf of the accused of general conversations between accused and a witness on the day of the homicide.

2. The opinion of a non-expert witness upon the subject of insanity is admissible only where he has had adequate opportunity to observe the conduct and appearance of the person alleged to be insane, and his judgment is shown to be based upon personal observation of the appearance, manner, habits and conduct of such person.

3. Where in a homicide case the defence is insanity, proof of the actuating cause of an alleged paroxysm should not be considered by the jury unless they find that at the time there was latent insanity or the latent tendency to insane paroxysm.

4. It is not error for the trial court in a murder case to refuse to allow a young physician who during his practice of two years has given his exclusive attention of nervous diseases in hospitals, and whose first examination of the accused was made at the trial six months after the homicide, to give his opinion as to whether three wounds on the person of the accused were made by one or two bullets.

5. In such a case, where it is sought to be shown that accused killed his wife during an attack of epilepsy, it is not error for the trial court to charge the jury that if accused was sane up to within a short time of the homicide, was sane afterwards and remained sane until the present time, they should find he was sane when he committed the act.

6. The law does not recognize emotional insanity as a defence in a homicide case.

No. 487.   Submitted June 7, 1895.   Decided June 19, 1895.

HEARING on appeal by a defendant convicted of murder and sentenced to death. *Judgment affirmed.*

The COURT in its opinion stated the case as follows:

The appellant, Thomas J. Taylor, was indicted in the Supreme Court of the District of Columbia for the murder, by shooting, of his wife, Nannie W. Taylor, about eight o'clock in the morning of September 14, 1894, at their residence in the city of Washington. He was convicted, and sentenced to execution ; and from the judgment of the court he has prosecuted the present appeal, in pursuance of exceptions to the rulings of that court at the trial.

On behalf of the prosecution it was shown that the woman was shot in the abdomen with a ball from a pistol, the ball passing almost straight backward and lodging against the spinal column ; that the defendant was found kneeling beside her as she was dying ; that he had attempted to commit suicide by shooting himself in the left breast ; that three wounds were found upon him, one where the ball entered, one where it came out, and a third upon the inside of the left arm, where, according to the contention of the prosecution, the ball entered when it came out of the breast, after glancing along the ribs about two inches ; that when he was discovered, the room was contaminated with powder smoke and a revolver was lying upon the table, containing five chambers, three yet loaded and two empty ; that the defendant jumped up, ran for his pistol, and said that he had shot himself and his wife ; and that he said he did not know whether his wound would prove fatal, but he thought his wife's probably would.

A physician called by the prosecution testified that the clothing of Mrs. Taylor, at the place where the bullet penetrated, was discolored by what seemed to him to be the blackening occasioned by powder ; and that she died on the same day from the effect of the shot. There was also a witness called to prove that, on the preceding day, Taylor had approached his wife with a pistol in his hand, seeing which the witness at once withdrew.

This was the substance of the testimony on behalf of the prosecution.

The defence was twofold: 1st. That the shooting of the wife was accidental, the claim being that a ball aimed by Taylor at his own breast rebounded and struck his wife; 2d. That at the time of the shooting, Taylor was suffering from epileptic insanity and had not the capacity to know what he was doing, or the capacity to distinguish right from wrong. In support of the theory that the shooting was accidental, the only testimony was an inference from the statement of Taylor himself testifying as a witness on his own behalf. The testimony for the defence was mainly directed to show that Taylor was subject to attacks of epilepsy, and that at the time of the homicide he was insane in consequence of these attacks or of some such attack.

In pursuance of this theory, one Lucy A. Davis was placed on the witness stand. She testified, in substance, that she had taken the defendant to raise him when he was only two years of age; that she had him under her care until he was about sixteen; that he was thirty-four years old at the time of the trial; that he was a healthy child up to the age of twelve; that about that time he was injured on the head by the kick of a horse; and that thereafter, as long as he lived with her, he was subject to violent headaches, contortions of the muscles, frothing of the mouth, nightmares, somnambulism, spasms and epileptic convulsions. She stated that he came to Washington in the year 1880; that she saw him thereafter every week; that in 1889 he and his wife boarded with her, and afterwards kept house in rooms rented from her; and she then proceeded to give an account of the various occupations which he had had since 1889, the last of which and the one which he was pursuing at the time of the homicide was that of driver of a wagon for a baker for the distribution of bread. Having testified that, on the day before the homicide was committed, he had come to her house and talked at random and looked so much like a maniac that she was afraid of him, she was asked, on behalf of the defence, what con-

versation she had with him at that time.   To this in-
quiry objection was made by the prosecution, which was
sustained by the court; and thereupon exception was duly
reserved on behalf of the defendant, which is the basis of
the first assignment of error.

A Mrs. Wagner, to whom the defendant had served
bread, was called to testify as to his conduct for some time
before the homicide; and she also proceeded to state what
the defendant had said.   Objection was made by the prose-
cution; but it would seem that the witness gave her state-
ment before the court had time to act upon the objection;
and the statement was to the effect that the defendant said
that he did not know why he was doing as he did.   Coun-
sel for the defence here stated that they thought they had a
right to know what the defendant had said with reference to
his failure to fill the order for bread; and the presiding justice
said that he thought not.   And this was made the ground
of the second exception, and the basis of the second as-
signment of error.

One Annie Kemp was called to testify that during the
week preceding the homicide the defendant's appearance
was wild, and that he did not fill her orders for bread cor-
rectly.   And she was then asked this question:

" From what you saw of him that week and your con-
versation with him, what was your opinion as to whether
he was in his right mind or not? "

Objection to this question by the prosecution was sus-
tained by the court.   Exception was taken; and the
exception is made the foundation of the third assignment
of error.

The defendant himself was then called as a witness on
his own behalf.   After giving testimony intended to show
that he had been frequently and constantly up to the time
of the homicide subject to epileptic fits, and after he had
stated that he had gone out about half past two o'clock of
the morning of the homicide on his usual delivery of
bread and had returned about half past four o'clock of the

same morning, to find the door of his bedroom locked, he was about to proceed to state what he heard and observed, when the prosecution objected. The counsel for the defendant here stated that the purpose was to show "the actuating or effective causes that produced the insanity" of the defendant. The court sustained the objection, and exception was taken on behalf of the defence.

Defendant's counsel then requested that the jury might retire so that counsel might state to the court precisely what they wished to prove in this connection, as this was the pivotal point of the case. But the court denied the request; and to this also exception was taken.

The court thereupon suggested to counsel to reduce to writing and hand to the court what it was proposed to prove here; and counsel did so. The substance of the proposition was to show that the deceased was unfaithful to her husband and to her marriage vows; that the defendant had evidence of this infidelity at the time specified; and that, upon remonstrating with his wife about it, he received a rude reply that indicated her purpose to continue in her supposed course of wrongdoing.

No action was taken upon this proposition at the time; but the testimony was afterwards admitted with some qualification.

The defendant proceeded to testify further that he went out again on his delivery of bread, and returned to breakfast, when he had a conversation with his wife. Objection was made to the introduction of this conversation; and the objection was sustained and exception taken.

The defendant then testified that, after the conversation with his wife, he seized his revolver, which was lying on the kitchen sideboard, fired at his own breast, tried to fire a second time, when his wife rushed to him and said: "Don't shoot yourself any more; I am not much hurt," and he himself exclaimed: "My God, Nannie! no; you are not hurt?" whereupon she exclaimed: "Not much; I can be saved." He stated that he then took her from

the kitchen into the dining-room, laid her on the sofa, and called for help ; and he added that he had no intention to kill her, and that he loved her better than his own life.

At this stage it was again sought by the defence to prove the conversation that took place at the time when the defendant seized the revolver ; but it was ruled out, and exception was taken.

Dr. William A. Hammond was then called to give his opinion whether the three wounds on the person of the defendant were made by one or two balls. Dr. Charles H. Emmons, who saw the wounds of the defendant six months after they were made, was asked the same question, to which objection was made, and the objection was sustained. To this also the defendant noted an exception.

Two letters were then offered in evidence on behalf of the defence, one signed by one " Lucindy Battles," and purporting to have been addressed to " Dear Mrs. Taylor," and the other addressed to " My Dear Girl," signed " J. Wm. M." But there was nothing to show whence the letters came, and nothing to connect them in any manner with the deceased. They were ruled out ; and to this ruling also exception was taken. But no assignment of error is based upon this exception, but upon a supposed ruling by the court, which the record does not show to have been made, excluding testimony of conversations between a witness and the defendant in relation to the so-called Battles letter.

At this stage of the proceedings the defendant himself was again called to the witness stand, and the court permitted all the testimony contained in the written proposition hereinbefore mentioned to be introduced, " with the restriction that the jury should not consider it unless they find that the man was insane at the time."

Lucy A. Davis, a witness who had already twice testified in the case, was then called by the prosecution for further cross-examination. She was asked whether on the day of the shooting she had not said to one Clara Brown, who had

called at her house, that she (the witness) had told the de-
fendant not to do this thing, and that he ought to be hung.
Witness denied having said this to Miss Brown; and the
latter was then called to the stand to prove that she had
said so.   Objection was duly made on behalf of the defend-
ant to this testimony; but the objection was overruled, and
an exception was taken.   Upon this exception the seventh
assignment of error on behalf of the appellant is based.

Testimony was then offered by the prosecution in rebut-
tal intended to show that the defendant had not been a kind
and affectionate husband; that he had repeatedly used per-
sonal violence towards his wife, and that he had not been
subject to epileptic fits, as claimed on his behalf.

With this the testimony on both sides was closed.   So
far as the record shows, no special instructions were re-
quested either by the prosecution or the defence; but the
court of its own motion charged the jury at some length.
To one sentence supposed to be contained in this charge
exception was taken by the defence; but we fail to find any
such sentence therein in the precise terms specified.   The
sentence, however, does occur in a colloquy between the
court and counsel at the end of the charge.   That colloquy
was as follows:

"*Counsel for defence:* I wish to take exception to so much
of the charge which in substance states that if they find he
was sane on the morning of the 14th of September and
that he is sane now they must find that he was sane during
the time the fatal shot was fired.

"*The Court:* I did not so state.

"*Counsel for defence:* You did in substance.

"*The Court:* No, sir; I did not in substance.   I said if
they believe he was sane all the time up to within a short
time before the firing of that shot, and was sane soon after-
wards and remained sane until the present time, they must
find he was sane when he fired the shot.

"*Counsel for defence:* To that, as it was taken down, I
note an exception."

We may assume that to all intents and purposes the exception was duly taken.

*Mr. O. D. Barrett* and *Mr. Edward G. Niles* for the appellant.

*Mr. Arthur A. Birney,* United States Attorney for the District of Columbia, for the United States.

Mr. Justice Morris delivered the opinion of the Court:

There are eight assignments of error; and the importance of the case, involving as it does the life of the defendant, is sufficient warrant for us to give each and all of them careful consideration in detail, in order that we may determine, what alone it is our province to determine, whether this defendant has had a fair and just trial according to law.

1. The first assignment of error is plainly untenable. If there is anything well settled in the law of evidence, it is that conversations between a witness and a defendant in a criminal cause cannot be given in evidence on behalf of the latter, when such conversations constitute no part of the transaction for which the defendant is arraigned. Greenleaf on Evidence, sec. 108, and cases cited in notes. We do not understand that this is controverted on behalf of the appellant as a general rule. We understand the argument to be that, when the defence of insanity is set up, an exception is thereby made to the general rule and conversations are admissible to show the development or the existence of insanity in the defendant. But if the laws of evidence are to be relaxed and conversations are to be admitted that are no part of the *res gestæ*, because counsel has announced that insanity is to be relied on as a defence, the laws of evidence might as well be wholly abandoned; for this would be only to throw open the doors to set up the defence of insanity, however unfounded, in all cases, and to allow defendants to manufacture testimony for themselves in advance

of contemplated delinquency. Insanity has often been simulated as a pretext for immunity from punishment ; and the vagaries of speech are the most easy resort for those who are disposed to have recourse to such simulation. Conversations that might readily be the result of design it would be most unsafe to permit to be introduced in evidence as proof of imsanity, without some other adequate indication of mental disorder.

It is very true, however, that conversations, as well as actions, may indicate mental disorder ; and in the Guiteau case statements of a morbid character made by the defendant were allowed to be proved in pursuance of the theory of insanity advanced in that case as a defence. But the insanity set up in that case was of a very different character from that supposed to have existed here ; and in view of the peculiar and most extraordinary circumstances of that case, an unusual latitude was allowed to the defence. But even there it was the statements of the defendant that were given in evidence, not the detailed conversations between him and the witnesses. The inquiry here was : " You may state what conversation you had with him at that time— what you said to him and what he said to you." This we believe is a broader and looser range of inquiry than has ever yet been allowed in any case. We fail to find any authority whatever to sustain it.

Moreover, there was no specific offer in this case to prove any specific conversation or statement of the defendant that would indicate insanity. If the conversation proposed to be proved contained any intimation of insane mind on the part of the defendant, it would have been easy to submit a specific offer to that effect and have the ruling of the court thereon. This was not done. The proposition was to introduce the conversations of the witness and defendant generally, and what the one said as well as the other. We think the court very properly excluded the testimony.

2. The second assignment of error is even more untenable than the first. It is addressed to the supposed exclu-

sion of testimony which was not in fact excluded. In pursuance of what we have said with reference to the first assignment, we think that, if it had been excluded, the ruling would have been entirely correct.

3. A somewhat different question is presented by the third assignment, the question of the right to have the opinion of a non-expert witness upon the insanity of the defendant under the circumstances that appear in the record. A witness, one Annie Kemp, was called for the defence. She seems to have been one of the persons to whom the defendant served bread; but it does not appear how long she had been receiving bread from him, how long she had known him, how frequently she had seen him, or whether she had ever seen him at all before the week immediately preceding the shooting. Her testimony does not appear in the record. Only the substance of it is given in this statement, that it " tended to prove that during the last week before the shooting the defendant's appearance was wild, that he looked wild out of his eyes, and that he did not fill her orders correctly for bread ; " and with only this preliminary justification, she was asked to give her opinion, from what she saw of him that week and from her conversations with him, of his sanity.

We think the court below was right in excluding that opinion. While there is very great and grave conflict of judicial authority with reference to the admission in evidence of the opinions of non-expert witnesses on the subject of insanity, we presume that, for this jurisdiction and for the Federal courts generally, the question has been authoritatively settled by the Supreme Court of the United States in the cases of *Insurance Co.* v. *Rodel,* 95 U. S. 232, and *Insurance Co.* v. *Lathrop,* 111 U. S. 612, in favor of the admission of such testimony. And if we may judge from the almost hopeless contradictions generally manifested by the testimony of so-called experts, it is not certain that non-expert testimony may not in most cases be equally good, if not better. But there are well-grounded limita-

tions upon both of these classes of testimony ; and the limitations are plainly indicated by Mr. Justice HARLAN, speaking for the Supreme Court in the case last cited. He says :

" While the *mere* opinion of a non-professional witness, predicated upon facts detailed by others, is incompetent as evidence upon an issue of insanity, his judgment, based upon personal knowledge of the circumstances involved in such an inquiry, certainly is of value   *   *   *   The truth is, the statement of a non-professional witness as to the sanity or insanity at a particular time, of an individual, whose appearance, manner, habits and conduct came under his personal observation *is not the expression of mere opinion.* In form, it is opinion, because it expresses an inference or conclusion based upon observation of the appearance, manner, and motions of another person, of which a correct idea cannot well be communicated in words to others, without embodying, more or less, the impressions or judgments of the witness.   But, in a substantial sense, and for every purpose essential to a safe conclusion, the mental condition of an individual, as sane or insane, is a fact ; and the expressed opinion of one who has had adequate opportunities to observe his conduct and appearance is but the statement of a fact."

It is plain, therefore, that only the opinion of a witness is admissible for this purpose who has had " adequate opportunity to observe the conduct and appearance of the party," and whose judgment is based " upon personal observation of the appearance, manner, habits and conduct " of the person to whom insanity is imputed.   No casual observer of an insolated fact can be held competent to express such an opinion.   The witness must appear to have had some adequate knowledge of the manner, habits and conduct of the supposed insane person before he can be permitted to give his impression or opinion of the mental condition of the person.   If the witness in the present case had such adequate knowledge, it does not appear from the record ; and it should have appeared as a preliminary to

the interrogatory propounded to her, in order to render her competent to answer the question. Evidently the witness gave to the jury all that she saw or knew; and it is not apparent that her opinion, based upon so slender premises, could have further enlightened them in their investigation of the matter.

4. With reference to the fourth assignment of error, if there was error in the exclusion of the testimony proposed to be given by the defendant as to what he heard and saw in his bedroom about half past four o'clock of the morning of the homicide, and as to the conversations between himself and his wife immediately before the fatal occurrence, it would seem that the error was cured by the subsequent admission of all this testimony precisely as it was proposed to be given. It is very true that the subsequent admission of it was with the restriction that the jury should not consider it unless they should find that the man was insane at the time; and this limitation or restriction would seem to destroy or nullify the effect of the testimony, and to be on its face an absurdity. For if the man was insane at the time, it is not apparent of what consequence the testimony could be one way or another in any aspect of the case. If he was insane at the time, he would be relieved from criminal liability without any reference whatever to this testimony. But it is plain to us from the context and from the subsequent charge of the court that the restriction was not intended by the court and was not understood by counsel in the sense which would reduce it to this absurdity. The testimony in question was offered by the defence for the express purpose, as stated in the record, of showing " the actuating or effective causes that produced the insanity;" and the theory of the defence was that the defendant was subject to epileptie seizures which for the time being dethroned his reason and which would readily be superinduced by such occurrences as those which the testimony was intended to prove. The insane tendency was presupposed or presumed to exist which these supposed actuating

causes would rouse into actual insanity. It was necessary to give substantial evidence of the pre-existing insane mental condition before proof of cause to actuate a paroxysm of it could be adduced. And it was in this sense undoubtedly that the restriction should be and was understood—that is, that the proof of actuating cause of insane paroxysm should not be considered by the jury unless the jury found that at the time there was latent insanity or the latent tendency to insane paroxysm which could be converted into actuality by these supposed effective causes.

In the charge, with reference to this testimony, the court said : " You must first find that he was insane on that morning before you can consider that evidence, and it only becomes proper for your consideration when and after you have determined that he was then insane. It is claimed that he was insane at the time from long continued disease, which had weakened and impaired his mind to the degree of irresponsibility, and that this condition, though it existed, had not theretofore manifested itself in any acts of violence—a kind of latent insanity, so to speak, waiting for some exciting cause to awaken it into activity and cause it to manifest itself in acts of violence—and this belief in his wife's unchastity, whether founded in fact or not, came suddenly upon him and developed the latent insanity which was already there, and in the first paroxysm of it he killed her. I say that this is the claim on the part of the defendant. Courts and text-writers all concur in pronouncing this a dangerous doctrine, and say that a jury should not apply it in any case except where the insanity is made out clearly to their satisfaction, aside from the evidence of the exciting cause."

It is clear, therefore, that the restriction was properly explained to the jury, and that no harm was done by it. And it is clear, also, that it was so understood and acquiesced in at the time by the counsel for the defendant. For no exception was taken to the part of the charge that has been cited, which is the part where the restriction was given to

the jury which the presiding justice said he would give when he admitted the testimony ; nor was there any exception taken to the restriction itself as announced by the court at the time. If the defendant, having procured the admission of the proposed testimony, objected to the restriction upon it, he should either have excepted to it then or at the time when it was given to the jury in the charge. Not having done so, he must be presumed to have acquiesced in it.

5. Exception was taken to the refusal of the trial court to permit Dr. Emmons, a young practitioner of medicine, of the age of 24 years, who had been in the practice of his profession for only two years, and who during that period had given his exclusive attention to nervous diseases in the hospitals, and was not shown to have had any experience whatever with gunshot wounds, to give his opinion as to whether the three wounds on the person of the defendant, which he only examined at the time of the trial, six months after the wounds had been inflicted, were caused by one or by two balls. We are wholly unable. to see upon what theory of the law of evidence, or upon what principle of reason, he was competent to speak as an expert. The court below was entirely right in excluding the answer to the question.

6. The sixth assignment of error purports to be based on the alleged refusal of the court below to permit the witness, Lucy Davis, to state the conversations had between herself and the defendant on the day before the homicide with reference to what is called the " Battles letter." If this assignment were correct, it would be disposed of by what we have already said in regard to the first assignment. But the record does not show that there was any such ruling by the court as is supposed. The record in this connection shows only that two letters were offered in evidence, one the " Battles letter " and the other a letter signed with the initials " J. Wm. M.," and that exception was taken to their exclusion. There was nothing whatever shown to connect these letters, or either of them, with any of the parties concerned in this transaction, and no evidence of any kind to justify their in-

troduction ; and we regard it as too plain for argument that the court below was right in excluding them.

7. The seventh assignment of error is founded upon the action of the trial court in permitting the prosecution in rebuttal to give evidence tending to contradict a statement by the witness Lucy Davis upon cross-examination. But this assignment has not been noticed in argument, either oral or in brief, on either side ; and seems to have been regarded as unimportant—as we also will assume it to be. We may, therefore, dismiss it without consideration.

8. There remains the eighth and last assignment of error, founded upon a sentence in the charge of the court or used by the presiding judge at the end of his charge and in explanation of it. This sentence is to the effect that if the jury should find that the defendant was sane all the time up to within a short time before the firing of the fatal shot and was sane afterwards and remained sane until the present time, they should find that he was sane when he fired the shot. It is claimed for the defence that it is well established by science that an epileptic may be sane up to within a moment of committing a homicide and sane a moment afterwards and totally unconscious of what he did during the intervening minutes by reason of an epileptic seizure which constitutes insanity during the time that it lasts ; and copious extracts were read to us from Doctor William A. Hammond's Treatise on Insanity in support of this position.

We fail to find in these citations any adequate reason for the overthrow of the safeguards of the law on which the security of society is founded. If there is any difference in reason or in principle between the theory of epileptic insanity as here advanced on behalf of the defendant and the theory of emotional insanity that has sometimes been resorted to as a defence of crime, but which has always and uniformly been reprobated and repudiated by the courts, we are unable to perceive it. If epileptic insanity is not different in its actual manifestations from emotional insanity,

then, harsh as it may seem, society for its own protection must continue to punish the one as well as the other, as a crime, and cannot permit it to pass with impunity as a shield for criminal action. But we understand that there is a very well defined distinction between epileptic insanity and what is called emotional insanity. While the paroxysms which superinduce the former may come on very suddenly, and while during the continuance of the epileptic condition acts of violence may be committed which the person would not commit in his sane moments, yet it is not apparent that violent action is ever the characteristic of the primary seizure. There are certain well developed symptoms that precede the insane action; and practically there is some considerable lapse of time before the tendency to violent action is developed, if any such tendency does in fact supervene; for that tendency in epilepsy seems to be exceedingly exceptional and of rare occurrence.

The law in regard to insanity as a defence to a charge for crime was clearly and correctly laid down by the presiding justice in this instance, with pertinent citations from approved authorities. But in language very emphatic, and yet exceedingly just, he sought to exclude from the consideration of the jury any idea that emotional insanity, so-called, had any place in our jurisprudence. He said to the jury:

"You should consider all and every item of evidence in the case in determining the question of sanity or insanity. Often, and I may say generally, the occurrences at and near the time of the alleged crime throw great light upon the question of sanity, when that is in issue. What were the acts, conduct, and declaration of the defendant a short time before and after and at the very time of the homicide? Were his conduct and conversations for days before and after and at the time of the shooting, taken as a whole, the acts, declarations, and conduct of a sane or insane man? Coming down to the morning of the homicide, did he return to his house about 4.30 o'clock that morning, and hear and see things that induced him to believe that his wife had then

recently been engaged in an act of adultery? If so, and he was insane at the time and his mind in that condition to be thrown out of balance by any sudden excitement, why did he not kill her then? Or is it more reasonable to suppose that, if he was insane, he would go away as he did and act later, after he had thought the matter over for awhile? Did he think it over at that time and at the time of the shooting? Did he have the mental power to think and consider, and, if he did, did he understand and know that, if his alleged suspicions against his wife were true, she was guilty of a great wrong? * * * Was he sane when he took his revolver from the place he did and fired the only shot he says he remembers? Was he sane when the people gathered to the scene of the homicide, and has he remained sane since? Is he sane now? Your answers to these questions will enable you to solve the question of sanity or insanity at the time of the homicide, which is the question for you. If he was insane during the occurrences above recited, it would be very reasonable to believe that he was insane at the very moment he fired the fatal shot; but if he was sane during that period and sane now, then the law requires that you should find him sane at the time he fired the fatal shot; for whatever may be the cry of scientific experts, the law does not recognize, but condemns, the doctrine of emotional insanity—that a man may be sane up until a moment before he commits a crime, insane while he does it, and sane again soon afterwards. Such a doctrine would be dangerous in the extreme. The law does not recognize it; and a jury cannot without violating their oaths."

It is this statement in regard to the doctrine of emotional insanity to which exception was intended to be taken. And it must be said that it is stated here with more precision than in the sentence in which, at the end of the charge, in the colloquy between himself and the counsel for the defence, the presiding justice stated what he had said on the subject.

But taking this sentence in connection with what was

actually said in the charge and what the jury were distinctly given to understand, we must hold that the law was correctly stated. The theory of emotional insanity is untenable under any circumstances. It was the purpose of the court absolutely to exclude that theory from the consideration of the jury. As we have said, if, in the opinion of the defence, the theory of epileptic insanity is thereby also excluded—and it is thereby only excluded upon the hypothesis that it is one and the same thing as emotional insanity—then it was properly excluded. If, on the other hand, the epileptic insanity claimed to have existed in this case was different from emotional insanity—and it does not become different by being called by a different name—it was not excluded from the consideration of the jury by the exclusion of the idea of emotional insanity.

On the whole, we do not find any error in the record of this case. It seems to us that the appellant had a fair and impartial trial according to the rules of law, and that his case was fairly submitted to the arbitrament of the jury, which alone was authorized to pass upon the question of his sanity or insanity, his guilt or innocence ; and we, therefore, feel ourselves constrained to *affirm the judgment. And it is so ordered.*