798 P.2d 914

**STATE of Idaho, Plaintiff–Respondent,**

v.

**Barryngton Eugene SEARCY,
Defendant–Appellant.**

No. 17835.

Supreme Court of Idaho.

Sept. 5, 1990.

William R. Forsberg, St. Anthony, for defendant-appellant.

Jim Jones, Atty. Gen., Lynn E. Thomas, Sol. Gen. (argued), Boise, for plaintiff-respondent.

BAKES, Chief Justice.

Barryngton Eugene Searcy appeals from convictions for first degree murder, robbery and an enhancement for the use of a firearm in the commission of a felony and from the following sentence:

1. First degree murder—determinate life sentence without possibility of parole;

2. Robbery—indeterminate life sentence to be served consecutively to the sentence pronounced for murder, with a minimum of ten years to be served;

3. Use of a firearm in the commission of murder and robbery—an enhancement of ten years;

Searcy raised several issues on appeal, including the argument that I.C. § 18–207 [1] unconstitutionally deprived him of his right to due process by forbidding him to plead an independent defense of insanity (mental nonresponsibility).

## I

Barry Searcy was convicted of killing Teresa Rice while robbing Jack's Grocery Store in Ashton, Idaho, July 15, 1987. Rice, the mother of two children, owned and operated the store with her husband Michael. Searcy robbed the store in order to get money to buy cocaine. Searcy had staked out the store during its operating hours and hid on top of some coolers in the back room where he waited to either burglarize or rob as the situation dictated. From this hiding spot Searcy could see Rice enter the back room and count out money for storage in the store's safe. Rice then left the back room. As Searcy was leaving his hiding spot Rice returned to the back room and discovered Searcy. A confrontation ensued and Rice was shot in the stomach by Searcy, apparently during a struggle. Searcy testified that he then told Rice that if she opened the safe he would call an ambulance. She did so. Searcy then removed the money from the safe and placed it into his backpack. Searcy did not call an ambulance. Rather, he put his rifle to Rice's head and shot her, killing her instantly.

After leaving the store, Searcy testified that he hid the rifle and money under a rock at a target shooting location near Rexburg, Idaho. The next day Searcy took some of the money and bought a used car with it in order to drive to Salt Lake City, Utah, to purchase more cocaine. On September 13, 1987, some boys discovered the

---

1. I.C. § 18–207 reads as follows:

   **18–207. Mental condition not a defense—Provision for treatment during incarceration—Reception of evidence.**—(a) Mental condition shall not be a defense to any charge of criminal conduct.

   (b) If by the provisions of section 19–2523, Idaho Code, the court finds that one convicted of crime suffers from any mental condition requiring treatment, such person shall be committed to the board of correction or such city or county official as provided by law for placement in an appropriate facility for treatment, having regard for such conditions of security as the case may require. In the event a sentence of incarceration has been imposed, the defendant shall receive treatment in a facility which provides for incarceration or less restrictive confinement. In the event that a course of treatment thus commenced shall be concluded prior to the expiration of the sentence imposed, the offender shall remain liable for the remainder of such sentence, but shall have credit for time incarcerated for treatment.

   (c) Nothing herein is intended to prevent the admission of expert evidence on the issues of mens rea or any state of mind which is an element of the offense, subject to the rules of evidence.

gun, money and Searcy's gloves. The boys showed the items to their fathers who were target shooting nearby. Discovery of these items lead to the arrest of Searcy.

Searcy was 20 years old at the time he killed Rice. He apparently is chemically dependant on alcohol and cocaine. Searcy's parents were divorced when he was eight. Searcy suffers from a physical condition known as delayed growth syndrome. This condition stunted Searcy's growth, allegedly making him the target of harassment from children in grade school. By the time he reached 15 years of age Searcy had the physical development of a 9 year old. Searcy began hormone treatments, but his growth was limited to 5 feet, 6 inches. Allegedly, the hormone treatments had a bad side effect and Searcy became mean and abusive. This ill effect was worsened by Searcy's introduction and addiction to chemicals: alcohol, marijuana and cocaine.

Searcy increasingly got into trouble as his chemical dependency continued while repeated efforts to treat it were not successful. Searcy committed burglaries, armed robberies, and sold illegal drugs in order to support his addiction to cocaine. Searcy had ambitions of becoming a major drug dealer but he personally used most of the cocaine he purchased. After using up a significant portion of the cocaine he bought from the money he stole from Jack's Grocery, Searcy began to contemplate robbing a bigger store in order to get more money. Instead of committing another robbery, Searcy entered treatment once again. While in treatment, Searcy confessed to a counselor that he had killed Rice.

At trial a jury found Searcy guilty of murder in the first degree by finding both premeditation and by finding that Searcy killed while committing a robbery. Searcy was also found guilty of robbery and of using a firearm while committing a felony.

Over objection, the trial judge at sentencing admitted a victim impact statement from Rice's family. Michael Rice, the victim's husband, indicated in the statement that he favored imposition of the death penalty for Searcy and that he felt it should be swiftly carried out. Nevertheless, the trial judge did not impose the death penalty on Searcy. Instead, the trial judge entered the following sentences on the various counts:

1. First degree murder—determinate life sentence without possibility of parole;

2. Robbery—indeterminate life sentence to be served consecutively to the sentence pronounced for murder, with a minimum of ten years to be served;

3. Use of a firearm in the commission of murder and robbery—an enhancement of ten years;

Searcy appeals from the conviction and sentences raising the following issues.

## II

■■■■ First Searcy argues that I.C. § 18–207 unconstitutionally denies him due process of law because it prevented him from pleading insanity as a defense.[2] Neither the federal nor the state Constitutions contains any language setting forth any such right. Searcy argues, nevertheless, that the disallowance of the insanity defense deprived him of one of the "fundamental principles of liberty and justice which lie at the base of our civil and political institutions," *Herbert v. Louisiana*, 272 U.S. 312, 316, 47 S.Ct. 103, 104, 71 L.Ed. 270 (1926), and thus denied him due process of law. Searcy argues the insanity defense is so deeply rooted in our legal traditions as to be considered fundamental and thus embedded in due process.

---

**2.** The State argues that Searcy did not raise the issue before the trial court, and therefore it was waived. We observe, however, that the defense presented testimony from a psychiatric expert, Dr. Kenneth Ash, concerning alleged facts which may have some bearing on Searcy's claim that he was mentally nonresponsible for the killing of Rice. We conclude that Searcy argu-

ably raised this issue before the trial court and thus it is preserved. However, we reject Searcy's claim. As discussed hereafter, there is no due process right under either the United States or Idaho Constitution to present such a defense. Rather, it is the prerogative of the legislature to decide (1) whether such a defense is available, and (2) what form such a defense will take.

The insanity defense has had a long and varied history during its development in the common law. As the understanding of the mental processes changed over the centuries, the implications of a criminal defendant's insanity have changed. In more recent times legislatures have enacted statutes regulating and defining the effect of a defendant's claim of mental nonresponsibility. Not surprisingly, there has resulted a wide disparity in the positions taken on this issue both by legislatures and courts in the various states.[3]

Three states, Idaho, Montana and Utah, have legislatively chosen to reject mental condition as a separate specific defense to a criminal charge. The statutes in these three states, however, expressly permit evidence of mental illness or disability to be presented at trial, not in support of an independent insanity defense, but rather in order to permit the accused to rebut the state's evidence offered to prove that the defendant had the requisite criminal intent or *mens rea* required by I.C. §§ 18–114 and 18–115 to commit the crime charged. I.C.

§ 18–207;[4] M.C.A. § 46–14–102; U.C. § 76–2–305. In *State v. Beam*, 109 Idaho 616, 621, 710 P.2d 526, 531 (1985) we upheld I.C. § 18–207 against a related challenge, stating:

We hold that the three statutes are not in conflict since I.C. §§ 18–114 and 18–115 do not mandate the existence of a defense based upon insanity, but rather I.C. § 18–207 reduces the question of mental condition from the status of a formal defense to that of an evidentiary question. Section 18–207(c), Idaho Code, continues to recognize the basic common law premise that only responsible defendants may be convicted.

It is Beam's second argument that I.C. § 18–207 violates the doctrine established by *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), which held that due process of law requires that the prosecution prove every fact necessary to constitute the crime charged beyond a reasonable doubt. It is asserted that I.C. § 18–207 impermissibly relieves the State of that burden,

---

**3.** One of the earliest formulations of the insanity defense and one still in use in as many as sixteen states is the *M'Naghten* rule. This rule is stated as follows:

[T]o establish a defense on the ground of insanity, it must be clearly proven that, at the time of the committing of the act, the party accused was labouring under such a defective reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing what was wrong.

*M'Naghten's Case,* 8 Eng.Rep. 718, 722 (1843).

Another test broadens the scope of the *M'Naghten* rule to include those who knew that their actions were wrong but who, as a result of a "disease of the mind," were unable to exercise control over their actions. This "irresistible impulse" test is used to supplement the *M'Naghten* rule in approximately five states.

Many states follow a variation of the American Law Institute (ALI) test which is a combination of the M'Naghten Rule and the "irresistible impulse" test. The ALI standard reads:

(1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect, he lacks substantial capacity either to appreciate the criminality (wrongfulness) of his conduct or to conform his conduct to the requirements of the law.

(2) As used in this article, the terms "mental disease or defect" do not include an abnor-

mality manifested only by repeated criminal or otherwise anti-social conduct.

American Law Institute, Model Penal Code (Proposed Official Draft, 1962), § 4.01, at p. 74. Among those states which follow the ALI test, some favor the word "wrongfulness" instead of "criminality." Still others remove the word "substantial."

New Hampshire is the only state which follows the *Durham* rule or "product" test. As set forth in *Durham v. United States,* 214 F.2d 862, 874–875 (D.C.1954), "a defendant is not criminally responsible if his unlawful act was a product of mental disease or defect."

Three other states have adopted unique standards drawing in part from the cognitive right-wrong language of the *M'Naghten* rule and the "irresistible impulse" test while adding other considerations, such as "prevailing community standards" and "legal and moral aspects of responsibility."

See, generally, I. Keilitz & J.P. Fulton, *The Insanity Defense and its Alternatives: A Guide for Policymakers,* Institute on Mental Disability and the Law, National Center for State Courts (October 1983).

**4.** I.C. § 18–207(c) provides: "Nothing herein is intended to prevent the admission of expert evidence on the issues of mens rea or any state of mind which is an element of the offense, subject to the rules of evidence."

since it operates as a presumption that no defendant can possess such lack of mental capacity as to be unable to formulate the criminal intent. We disagree. I.C. § 18–207(c) specifically provides that a defendant is not prohibited from presenting evidence of mental disease or defect which would negate intent.

While the issue facing us today has never been directly decided by the United States Supreme Court, the language from several opinions of that Court suggests rather convincingly that that Court would conclude that the due process of the fifth amendment does not require the states to provide a criminal defendant with an independent defense of insanity. First, in *Leland v. Oregon*, 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952), the United States Supreme Court rejected an argument that due process required the use of any particular insanity test and upheld an Oregon statute which placed on the criminal defendant the burden of proving his insanity defense, and then by proof beyond a reasonable doubt. In *Powell v. Texas*, 392 U.S. 514, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968), the Supreme Court stated:

> [T]his court has never articulated a general constitutional doctrine of *mens rea*. We cannot cast aside the centuries-long evolution of the collection of interlocking and overlapping concepts which the common law has utilized to assess the moral accountability of an individual for his antisocial deeds. The doctrines of *actus reus, mens rea,* insanity, mistake, justification, and duress have historically provided the tools for a constantly shifting adjustment of the tension between the evolving aims of the criminal law and changing religious, moral, philosophical, and medical views of the nature of man. *This process of adjustment has always been thought to be the province of the States.*[5]

392 U.S. at 535–536, 88 S.Ct. at 2156, 20 L.Ed.2d at 1269 (emphasis added). Justice Marshall, in his *Powell* opinion, stated that

"nothing could be less fruitful than for this Court to be impelled into defining some sort of insanity test in constitutional terms." 392 U.S. at 536, 88 S.Ct. at 2156. Justice Rehnquist recently reaffirmed this view in his dissenting opinion in *Ake v. Oklahoma*, 470 U.S. 68, 91, 105 S.Ct. 1087, 1100, 84 L.Ed.2d 53, 71 (1985), in which he wrote:

> [I]t is highly doubtful that due process requires a state to make available an insanity defense to a criminal defendant, but in any event if such a defense is afforded the burden of proving insanity can be placed on the defendant.

In a similar vein, the Ninth Circuit Court of Appeals has very recently rejected the argument that the eighth amendment to the United States Constitution contains any implicit command that mental illness be considered a mitigating circumstance. *Harris v. Pulley*, 885 F.2d 1354 (9th Cir.1989).

The Supreme Court of Montana has upheld a similar Montana statute abolishing the independent defense of insanity, concluding that "Montana's abolition of the insanity defense neither deprives a defendant of his fourth amendment right to due process nor violates the eighth amendment proscription against cruel and unusual punishment. There is no independent constitutional right to plead insanity." *State v. Korell*, 690 P.2d 992 (1984).

In conclusion, on this issue, while there is little authority directly on the question which we must decide today, the only court which has expressly ruled upon this issue has upheld the constitutionality of a state statute abolishing the insanity defense. *State v. Korell, supra.* The only justice of the United States Supreme Court, Chief Justice Rehnquist, who has addressed this specific issue has stated, "It is highly doubtful that due process requires the state to make available an insanity defense to a criminal defendant...." Finally, from the statement of the United States Supreme Court in *Powell v. Texas*, that "noth-

---

5. Although the Court in *Powell* stated that "this court has never articulated a general constitutional doctrine of *mens rea*," the Idaho state statutory scheme retains on the prosecution the burden of proving the requisite state of mind, *i.e., mens rea,* and the other essential elements of the crime beyond a reasonable doubt, *State v. Beam,* 109 Idaho 616, 710 P.2d 526 (1985).

ing could be less fruitful than for this court to be impelled into defining some sort of insanity test in constitutional terms," it is difficult to understand how there could be an insanity defense guaranteed by the United States Constitution which, nevertheless, has no constitutional definition and is subject to differing definitions by the various states, *Powell v. Texas, supra,* and may be subject to differing burdens of proof by the states. *Leland v. Oregon, supra.* Accordingly, we conclude, based upon the foregoing authorities, that due process as expressed in the Constitutions of the United States and of Idaho does not constitutionally mandate an insanity defense and that I.C. § 18–207 does not deprive the defendant Searcy of his due process rights under the state or federal Constitution. *Leland v. Oregon, supra; State v. Korell,* 213 Mont. 316, 690 P.2d 992 (1984); *Leland v. Oregon, supra; Powell v. Texas, supra; State v. Beam, supra.*[6]

### III

■ We now consider Searcy's objection that the trial court erred by denying his motion to strike a victim impact statement which was allegedly used as a basis for arriving at the sentence. Searcy asserts that the sentencing court improperly considered prejudicial remarks contained in the victim impact statement when imposing on Searcy a fixed life prison term. Searcy argues that the victim impact statement

was irrelevant to sentencing considerations even though he acknowledges that its use by the sentencing court is mandated by I.C. § 19–5306[7] and I.C.R. 32(b)(1).[8] Searcy argues, however, that the sentencing court was obliged to ignore the victim impact statements based upon the holdings in *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), and *State v. Charboneau,* 116 Idaho 129, 774 P.2d 299 (1989). However, those two cases were death penalty cases and the decisions are based on the unique requirements of the eighth amendment of the United States Constitution as it applies to death penalty cases. In the present case where the defendant was not sentenced to death but, rather to a fixed life prison term, the *Booth* and *Charboneau* cases are inapplicable. The sentencing court did not err by denying defendant's motion to strike the victim impact statement.

### IV

#### A.

■ Searcy argues that the trial court imposed an invalid sentence when it gave a ten-year enhancement both to the determinate life sentence without possibility of parole for the premeditated first degree murder, and a ten-year enhancement to the consecutive indeterminate life sentence imposed for the crime of robbery. As a result, Searcy argues that he should have

---

**6.** Three early state court decisions holding that statutes which abolish the insanity defense are unconstitutional are distinguishable because those decisions had involved state statutes which precluded any trial testimony of mental condition, including trial testimony which would have rebutted the state's evidence of the defendant's state of mind, *i.e., mens rea,* at the time he committed the offense. Those cases are *State v. Lange,* 168 La. 958, 123 So. 639 (1929); *Sinclair v. State,* 161 Miss. 142, 132 So. 581 (1931); and *State v. Strasburg,* 60 Wash. 106, 110 P. 1020 (1910).

**7.** I.C. § 19–5306 provides in pertinent part:
(1) Upon request, each victim of a felony offense shall be:

.　　.　　.　　.　　.

(b) Consulted by the presentence investigator during preparation of the presentence report and have included in that report a statement of

the impact which the defendant's criminal conduct has upon the victim;
(c) Afforded the opportunity to address under oath, the court at sentencing;
. . . .

**8.** I.C.R. 32 provides in pertinent part:

.　　.　　.　　.　　.

(b) Contents of presentence report. ... [W]henever a full presentence report is ordered, it shall contain the following elements:
(1) The description of the situation surrounding the criminal activity with which the defendant has been charged, including the defendant's version of the criminal act and his explanation for the act, the arresting officers's version or report of the offense, where available, *and the victim's version where relevant to the sentencing decision.*
. . . .
(Emphasis added.)

been present when the trial court corrected the sentence. Both enhancements were based upon I.C. § 19–2520 which provides for an extended sentence for use of a firearm or deadly weapon in the commission of felonies, as were charged here. However, I.C. § 19–2520E provides that "any person convicted of two (2) or more substantive crimes provided for in the above code sections, which crimes arose out of the same indivisible course of conduct, may only be subject to one (1) enhanced penalty."

The trial court recognized that the imposition of the two enhancements violated the above section and, in response to Searcy's I.C.R. 35 motion to correct or reduce sentence, corrected its previous sentence by stating that "the court will correct the sentence and order that the defendant Barryngton Eugene Searcy be sentenced to a term of ten years as an enhancement for having used a deadly weapon in the commission of the crime of murder and the crime of armed robbery."

Searcy argues on appeal that the original sentence (which included two 10–year enhancements) being invalid, the trial court could not correct the invalid sentence without having the defendant present in court, as required by I.C. § 19–2503 which provides that "for the purpose of judgment, if the conviction is for a felony, the defendant must be personally present...." Searcy also relies on I.C.R. 43(a), which provides:

> **Rule 43. Presence of the defendant.—** (a) Presence required. The defendant shall be present at the arraignment, at the time of the plea, at every stage of the trial including the impaneling of the jury and the return of the verdict, *and at the imposition of sentence*, except as otherwise provided by this rule.

(Emphasis added.) In *Lopez v. State*, 108 Idaho 394, 700 P.2d 16 (1985), this Court held that where "the original sentence was invalid, the sentence was not imposed until the court corrected the judgment." 108 Idaho at 396, 700 P.2d at 18. In *Lopez* we

remanded to the trial court with instructions to re-impose a correct sentence at a proceeding at which the defendant was present.

In this case, the original sentence imposed on Searcy which contained two separate enhancements, was invalid since it violated I.C. § 19–2520E. Under *Lopez* the trial court could not correct the sentence without the defendant being present.[9] Accordingly, we remand for correction of the sentence in the defendant's presence. *Lopez v. State, supra.*

### B.

■ Since we are remanding for correction of the invalid sentence in the presence of the defendant, we note two other sentencing claims made by the appellant Searcy. Searcy claims that the trial court erred in imposing a single enhancement against both the first degree murder sentence and the robbery sentence. Furthermore, Searcy argues that a determinate life sentence without possibility of parole cannot be, as a matter of logic, enhanced by a ten-year enhancement under I.C. § 19–2520. Searcy relies on the opinion of the Court of Appeals in *State v. Kaiser*, 106 Idaho 501, 503, 681 P.2d 594, 596 (Ct.App.1984), in which the Court of Appeals, in reviewing the effect of the enhancement provisions of I.C. § 19–2520, stated that, "A life sentence does not allow for any further 'enhancement.'" On petition for review this Court vacated the Court of Appeals decision in *Kaiser*, stating, "Although the reasoning of the Court of Appeals is persuasive regarding fixed life and death penalty sentences, we are convinced that an indeterminate life sentence is a horse of a different color." *State v. Kaiser*, 108 Idaho 17, 19, 696 P.2d 868, 870 (1985). Searcy further relies on the comment of Judge Swanstrom in *State v. Merrifield*, 112 Idaho 365, 732 P.2d 334 (Ct.App.1987), in which he stated, "It would be a useless act

---

**9.** I.C.R. 43(c)(4) provides that the defendant need not be present if the trial court reduces a sentence under I.C.R. 35 based on leniency and not because the court is correcting an invalid sentence. However, if the sentence is invalid,

the presence of the defendant is mandated by our decision in *Lopez v. State, supra. See also State v. Money*, 109 Idaho 757, 710 P.2d 667 (Ct.App.1985).

to enhance a fixed life sentence where there is no possibility of parole." We need not resolve whether or not the legislature can enhance a "fixed life sentence where there is no possibility of parole," nor whether such an enhancement is provided by I.C. § 19–2520 if there were only a conviction of first degree murder in this case. Here, Searcy was convicted of robbery as well as first degree murder. The single 10–year enhancement on the robbery conviction was justified by the statute.

## C.

■ Finally, we consider Searcy's argument that his sentence was unreasonable or unduly severe. As modified in the trial court, Searcy was sentenced to a fixed life term for first degree murder and an indeterminate life term for robbery enhanced by an additional ten years for use of a firearm in the commission of robbery. Each of these two sentences falls within the maximum sentences for each crime. Notably, Searcy may have received the death penalty for the first degree murder conviction. Searcy argues that the district court abused its discretion by basing the sentences entirely on retribution and by failing to consider rehabilitation, societal protection, or deterrence. We disagree. In denying Searcy's I.C.R. 35 motion for reduction of sentence, the district court wrote:

> The Court found that the murder was planned and carried out in an atrocious, cruel and heinous manner and that the sordid circumstances manifested exceptional depravity. Any mitigating circumstances were evasive amounting mainly to his youth. The mitigating circumstances were sufficient to avoid capital punishment, but they can not be expanded to call for further leniency.

We can find no abuse of discretion present in the district court's reasons for sentencing Searcy as it did, especially upon consideration of the cold-blooded nature of the murder of Teresa Rice. Searcy's alleged addiction to cocaine and troubled childhood do not excuse his crime or mandate a lesser sentence. Accordingly, we conclude that the district court did not abuse its discretion in sentencing Searcy as it did in the modified sentence.

The judgment of conviction entered by the trial court herein is affirmed. The trial court's order dated October 3, 1988, correcting the sentence imposed on Searcy in his absence, is vacated and the cause remanded to the trial court for imposition of a valid sentence with the defendant present as required by I.C. § 19–2505, I.C.R. 43(a), and *Lopez v. State,* 108 Idaho 394, 700 P.2d 16 (1985).

BOYLE, J., and WOODLAND, J. pro tem., concur.

JOHNSON, Justice, concurring and dissenting.

I concur with the opinion of the Court, except as to the insanity defense. While I concur in that part of the dissent of Justice McDevitt that deals with the unconstitutionality of the abolition of the insanity defense under the due process clause of the fourteenth amendment, I also would hold independently that the abolition violates the due process clause contained in art. 1, § 13 of the Idaho Constitution.

As this Court said in *Cootz v. State,* 117 Idaho 38, 40–41, 785 P.2d 163, 165–66 (1989):

> We agree that the scope of the Idaho due process clause is not necessarily the same as that of the federal constitution
>
> . . . .
>
> We note with interest that just 100 years ago when our state constitution was being formulated the question of the inclusion of the due process clause was considered. When the proposed art. 1, § 13 was amended to insert the due process clause, the objection was made that the same language existed in the fourteenth amendment to the Constitution of the United States. Despite this objection, the section containing the due process clause was adopted. Proceedings and Debates of the Constitutional Convention of Idaho (1889) 287, 1595. While this does not establish by itself that the scope of our due process clause is different than that of the federal constitution,

it does indicate that the drafters of our constitution believed that the federal due process clause did not make it unnecessary for our constitution to guarantee due process of law.

We also note that from time to time this Court has said in passing that our constitutional provision relating to due process of law is substantially the same as that of the United States Constitution. *E.g., State v. Peterson,* 81 Idaho 233, 236, 340 P.2d 444, 446 (1959). However, we find no decision of this Court that has squarely addressed the question of whether the scope of our due process clause is the same as that of the fourteenth amendment. Today, we conclude that the scope is not necessarily the same. We are prepared to consider the parameters of due process under art. 1, § 13 of our constitution without being necessarily bound by the interpretation given to due process by the United States Supreme Court. *Cf. State v. Thompson,* 114 Idaho 746, 760 P.2d 1162 (1988) (Idaho's constitutional provision prohibiting unreasonable searches and seizures is subject to different interpretation than that given to the fourth amendment.).

We also note that from time to time this Court has decided due process questions with reference to our state constitution only, without considering the scope of the fourteenth amendment. *E.g., State v. Evans,* 73 Idaho 50, 56, 245 P.2d 788, 791 (1952); *White v. Idaho Forest Indus.,* 98 Idaho 784, 786, 572 P.2d 887, 889 (1977); *Melody's Kitchen v. Harris,* 114 Idaho 327, 333, 757 P.2d 190, 196 (1988). These cases are evidence that this Court has not always found it necessary to resort to decisions of the United States Supreme Court under the fourteenth amendment to decide what content we will give to our own due process clause.

The insanity defense was well established in the Territory of Idaho at the time of the Idaho Constitutional Convention and continued to be part of our jurisprudence until the legislature purported to abolish it in 1982. It has been part of the process

that was due defendants in criminal cases for virtually the entire existence of our Idaho legal system. It is fundamental to our jurisprudence and is protected by the due process clause of art. 1, § 13.

I am aware that there are other death penalty cases that will be argued before this Court within a matter of days that will again raise the issue of the unconstitutionality of the abolition of the insanity defense. Because the insanity defense is fundamental and because of the awesomeness of death penalty cases, I announce to my brethren on this Court today that I will be prepared to address this issue again in these future death penalty cases, despite the ruling of the Court in this case.

McDEVITT, J., concurs.

McDEVITT, Justice, dissenting.

I cannot agree with the majority's conclusion that the due process guarantee of the United States Constitution does not require the availability of the insanity defense in a criminal case.

In support of its conclusion, the majority opinion implies that the statute abolishing the defense in Idaho was previously upheld by this Court in *State v. Beam,* 109 Idaho 616, 710 P.2d 526 (1985), *cert. denied,* 476 U.S. 1153, 106 S.Ct. 2260, 90 L.Ed.2d 704 (1986). However, the holding in *Beam* is not relevant to the present case. In *Beam,* this Court held that I.C. § 18–207 did not violate the principle of due process that the prosecution must prove every element of a crime beyond a reasonable doubt. In the present case we are faced with the entirely separate issue of whether there is a different principle contained within the concept of due process which would require the availability of a defense of insanity in a criminal case.

The majority next notes that there is no explicit holding from the United States Supreme Court on this issue, and proceeds to examine several Supreme Court cases seeking some guidance. The opinion states that:

[In] *Leland v. Oregon,* 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed.2d 1302, 96 L.Ed.

1302] (1952), the United States Supreme Court rejected an argument that due process required the use of any particular insanity test and upheld an Oregon statute which placed on the criminal defendant the burden of proving his insanity defense, and then by proof beyond a reasonable doubt.

At 636, 798 P.2d at 918.

I do not believe that the holding in *Leland* leads to the conclusion that the insanity defense is not contained within the concept of due process.

One of the remarkable features of the history of the United States since the adoption of the Constitution is the astounding progress of science and technology. It is indisputable that the science of psychiatry has significantly evolved during that period, and that it continues to evolve, not only due to new approaches to conceptualizing mental processes, but also due to the advancement of pharmacological knowledge and even mechanical technologies which serve to enhance our understanding of and the ability to treat mental disorders.

It is this fact which dictated the holding of *Leland v. Oregon* that the Constitution does not require the use of one particular test of criminal responsibility. The Supreme Court noted that the "right and wrong" test of legal insanity was the rule in the majority of American jurisdictions, but stated that:

> The science of psychiatry has made tremendous strides since that test was laid down in M'Naughten's Case, but the progress of science has not reached a point where its learning would compel us to require the states to eliminate the right and wrong test from their criminal law. Moreover, choice of a test of legal sanity involves not only scientific knowledge but questions of basic policy as to the extent to which that knowledge should determine criminal responsibility. This whole problem has evoked wide disagreement among those who have studied it. In these circumstances it is clear that the adoption of the irresistible impulse test is not "implicit in the concept of ordered liberty."

*Leland v. Oregon,* 343 U.S. at 800–01, 72 S.Ct. at 1008–09 (footnotes omitted).

Thus, the *Leland* decision is properly read to hold that no one test of insanity has been proven so scientifically reliable as to amount to a constitutional prohibition of the use of any other test by the mandates of due process. Instead, the Supreme Court in *Leland* recognizes that the science of psychiatry is not yet so accurate that it has the capacity to formulate a standard that will accurately quantify mental responsibility in all individual cases.

Nor does the fact that the Supreme Court in *Leland* allowed the allocation of the burden of proof of insanity to the defendant indicate any opinion by that Court as to whether the insanity defense is rooted in the Constitution. *Leland* is part of a series of decisions by the Supreme Court which hold that:

> [I]t is normally "within the power of the State to regulate *procedures* under which its laws are carried out, including the burden of producing evidence and the burden of persuasion," and its decision in this regard is not subject to proscription under the Due Process Clause unless "it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked fundamental." *Speiser v. Randall,* 357 U.S. 513, 523, 78 S.Ct. 1332, 1341, 2 L.Ed.2d 1460 (1958); *Leland v. Oregon,* 343 U.S. 790, 798, 72 S.Ct. 1002, 1007, 96 L.Ed. 1302 (1952); *Snyder v. Massachusetts,* 291 U.S. 97, 105, 54 S.Ct. 330, 332, 78 L.Ed. 674 (1934).

*Patterson v. New York,* 432 U.S. 197, 201–02, 97 S.Ct. 2319, 2322, 53 L.Ed.2d 281 (1977) (emphasis added).

The case of *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), held that due process requires the prosecution in all cases to prove every element of the crime charged beyond a reasonable doubt. Thus, in *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), where the Maine statute defined murder as an intentional homicide committed without provocation, the Court held that the burden of proving provocation could not be placed

on the defendant. To do so would offend the due process and the mandate of *In re Winship,* because the defendant would then be required to disprove an element of the crime charged.

By contrast, shifting the burden of proof of extreme emotional disturbance to the defendant in order to reduce the crime from murder to manslaughter did not offend due process in *Patterson v. New York,* 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977), where the state statute defined second degree murder, the crime with which Patterson was charged, as intentional killing (first degree murder being defined as intentional killing with malice aforethought). Extreme provocation was made available as an affirmative defense to murder by statute. Because the defendant was not required to disprove an element of the crime and the state's definition of the crime was within constitutional bounds, the allocation of the burden of proof of the affirmative defense was not violative of the Constitution.

Likewise, in *Martin v. Ohio,* 480 U.S. 228, 107 S.Ct. 1098, 94 L.Ed.2d 267 (1987), Ohio law defined self defense as an affirmative defense subject to proof by the defendant, and defined the crime of murder as purposely causing the death of another with prior calculation or design. The Court held that the state was within its constitutional authority in defining the offense, and that the fact that the defendant was not required to disprove any element of the crime charged sufficed to withstand a due process challenge. The Court noted its prior holding in *Patterson,* and said:

We there emphasized the preeminent role of the States in preventing and dealing with crime and the reluctance of the Court to disturb a State's decision with respect to the definition of criminal conduct and the *procedures* by which the criminal laws are to be enforced in the courts, including the burden of producing evidence and allocating the burden of persuasion.

*Martin v. Ohio,* 480 U.S. at 232, 107 S.Ct. at 1101 (emphasis added).

*Patterson* and *Martin* both made prominent reference to *Leland v. Oregon* in the course of their holdings. If the *Leland* holding that the burden of proof of the affirmative defense of insanity may be shifted to the defense is to be read as an implicit holding that the insanity defense is not required by due process, the above cited cases would equally indicate that the traditional concepts of justification or excuse represented by the defenses of extreme provocation and self defense are also not "so rooted in the traditions and conscience of our people" as to be implicit within due process.

This result is not attainable in light of the Supreme Court's analysis in the above cited cases. In each case, the Supreme Court noted that throughout the distant history of the common law and at the time of the adoption of the Due Process Clause of the Fifth Amendment and the ratification of the Fourteenth Amendment, affirmative defenses, including provocation and self defense, were subject to proof by the defendant. It was not until the relatively recent case of *Davis v. United States,* 160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499 (1895), wherein the United States Supreme Court shifted the burden of proof to the prosecution in federal courts to disprove insanity as a matter of federal procedure without constitutional basis, that the majority of American jurisdictions reversed the traditional rule and began to place the burden of disproving insanity and other affirmative defenses upon the State. *Mullaney,* 421 U.S. at 693–97, 95 S.Ct. at 1886–88; *Patterson,* 432 U.S. at 203–04, 97 S.Ct. at 2323; *Martin,* 107 S.Ct. at 1103. As the very test of due process depends upon historical traditions, the Supreme Court's repeated emphasis of the history of the affirmative defenses at issue in each of these cases belies the contention that the burden of proof on an issue may only be shifted where the underlying substantive doctrine is constitutionally insignificant.

Thus, it cannot be said that by allowing the burden of proof to be shifted away from the prosecution on issues which are not elements of the crime charged, the Supreme Court is thereby sanctioning the abolition of the underlying substantive

criminal legal traditions. Rather, the allocation of the burden of proof has been treated by that court as a *procedural* issue which is left to the sovereign prerogatives of the states, so long as the exercise of that prerogative does not offend the mandates of the federal Constitution. The ponderous history of affirmative defenses, such as heat of passion and self defense outlined by the Supreme Court are significant indicators of the place of those affirmative defenses within the concept of due process in the United States, even though, as in the case of the insanity defense, the United States Supreme Court has not yet had occasion to expressly affix them within the requirements of the Constitution.

The majority opinion next cites the United States Supreme Court opinion in *Powell v. Texas*, 392 U.S. 514, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968), wherein the Court rejected the appellant's claim that he could not constitutionally be punished for being drunk in public because he was an alcoholic suffering from an irresistible compulsion to drink. The appellant argued that his conviction would be unconstitutional under *Robinson v. California*, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962), where it was held that to convict a person for the mere *status* of being a drug addict, without proof of any positive act, would violate the Eighth Amendment's prohibition against cruel and unusual punishment. The Court disagreed, distinguishing the situation in *Robinson*, where there was no criminal act alleged, from the case before it in *Powell*, where the defendant was convicted for drunk and disorderly *conduct*. The opinion also relied upon the fact that medical knowledge and the state of the record did not permit an authoritative conclusion that alcoholics in general, and Powell in particular, were incapable of controlling the urge to drink, but that even if that were established, there was certainly no evidence that such individuals were irresistibly compelled to drink in public.

The Court further noted that to forbid criminal sanction against any person who could not control their actions would be in effect, the articulation of a static minimum definition of *mens rea* by the Court along the lines of the irresistible impulse test of insanity. Such a holding would irrevocably cement into the Constitution a test of criminal responsibility which itself is the product of a continually changing evolution of scientific knowledge and community ethics, and which is only one of several tests of criminal responsibility that has been used throughout the development of the criminal law:

> Nothing could be less fruitful than for this Court to be impelled into defining some sort of insanity test in constitutional terms. Yet that task would seem to follow inexorably from an extension of *Robinson* to this case. If a person in the "condition" of being a chronic alcoholic cannot be criminally punished as a constitutional matter for being drunk in public, it would seem to follow that a person who contends that, in terms of one test, "his unlawful act was the product of a mental disease or defect," *Durham v. United States* ... 214 F.2d 862, 875, 45 A.L.R.2d 1430 (1954), would state an issue of constitutional dimension with regard to his criminal responsibility had he been tried under some different and perhaps lesser standard, *e.g.* the right-wrong test of *M'Naughten's Case*. The experimentation of one jurisdiction in that field alone indicates the magnitude of the problem. *See, e.g., Carter v. United States* ... 252 F.2d 608 ([D.C.Cir.] 1957); *Blocker v. United States*, 107 U.S.App.D.C. 63, 274 F.2d 572 (1959); *Blocker v. United States*, 110 U.S.App.D.C. 41, 288 F.2d 853 (1961) (*en banc*); *McDonald v. United States*, 114 U.S.App.D.C. 120, 312 F.2d 847 (1962) (*en banc*); *Washington v. United States*, 129 U.S.App.D.C. 29, 390 F.2d 444 (1967). But formulating a constitutional rule would reduce, if not eliminate, that fruitful experimentation, and freeze the developing productive dialogue between law and psychiatry into a rigid constitutional mold. It is simply *not yet time* to write the Constitutional formulas cast in terms whose meaning, let alone relevance, is not yet clear either to doctors or lawyers.

**644**

*Powell,* 392 U.S. at 536–37, 88 S.Ct. at 2156 (footnotes omitted) (emphasis added).

The majority opinion cites another passage from *Powell:*

> We cannot case aside the centuries-long evolution of the collection of interlocking and overlapping concepts which the common law has utilized to assess the moral accountability of an individual for his antisocial deeds. The doctrines of *actus reus, mens rea,* insanity, mistake, justification, and duress have historically provided the tools for a constantly shifting adjustment of the tension between the evolving aims of the criminal law and changing religious, moral, philosophical, and medical views of the nature of man. This process of adjustment has always been thought to be the province of the States.

*Id.,* 392 U.S. at 535–36, 88 S.Ct. at 2156 (footnotes omitted).

Reading the two passages from *Powell* together, it is clear that the central rationale of the holding is the amorphous nature of some of the fundamental premises of criminal law. The Supreme Court was clearly impressed by the limitations inherent in attempting to define in static terms philosophical concepts which underlie our society's definitions of criminal culpability. The Court has repeatedly indicated that it is the role of the States to structure their criminal legal systems, and that the United States Supreme Court may only proscribe what is forbidden by the Constitution; it has no authority to tell the States how, within the bounds of the Constitution, they should arrange their own affairs. Therefore, as long as a State action does not overreach constitutional limitations, the States are free to define their own community standards of criminal culpability.

In this setting, the Court fully realized that it could not adopt one magic phrase to encompass all issues of moral accountability, in the absence of a particular formulation expressly required by the Constitution, or a "principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental," and thus deemed implicit within the concept of due process. The doctrines enumerated in the majority's excerpt from *Powell: actus reus, mens rea,* insanity, mistake, justification, and duress, have varied so greatly over the course of legal history, and continue to evolve in such unanticipated ways, that the Court rightly recognized that no particular formulation has impeccable credentials in the annals of the common law, or is particularly likely to survive the explosive expansion of human knowledge and understanding.

These are the considerations which underlie the decision in *Powell v. Texas,* and I cannot accept the majority's reading of that opinion as an implicit rejection of the insanity defense as a doctrine rooted in the Constitution. Indeed, the Supreme Court's enumeration of the insanity defense in the cherished and distinguished company of the doctrines of *actus reus, mens rea,* mistake, justification, and duress lends force to the argument that insanity is on equal par with those concepts within the Constitution. Although *Powell* leaves the process of the adjustment of the tension between those concepts to the States, it certainly does not imply that the States may constitutionally abolish each, or any, of those doctrines without running afoul of the Constitution. I cannot believe that the majority would concede that a criminal justice system deprived of those features would comport with due process.

The majority opinion further relies upon the dissent of Justice Rehnquist in the case of *Ake v. Oklahoma,* 470 U.S. 68, 91, 105 S.Ct. 1087, 1098, 84 L.Ed.2d 53 (1985), wherein it was written that, "[I]t is highly doubtful that due process requires a state to make available an insanity defense to a criminal defendant, ..." This observation establishes no precedent, as it is only the lonesome concern of a single dissenter.

The majority opinion also looks for support in a Ninth Circuit Court of Appeals case holding that the Eighth Amendment does not require mental illness to be considered as a mitigating circumstance. That holding addresses the issue of mitigating circumstances, *i.e.,* circumstances to be considered in the post-conviction sentencing

decision; this issue is not at all relevant to the question of whether the Constitution permits an individual to be held accountable in the first instance, when the community standard must determine whether the moral blameworthiness of the act permits criminal conviction at all.

Finally, the majority implies that the fact that the Idaho statute abolishing the insanity defense continues to permit psychiatric evidence going to the issue of *mens rea*, or whether the defendant had the capacity to form the intent which is an element of the crime, saves the law from due process challenge. This was the position taken in the Montana case of *State v. Korell*, 213 Mont. 316, 690 P.2d 992 (1984), the only other court to consider the identical issue with which this Court is presently faced.

The Montana Supreme Court, in considering whether the insanity defense was required by due process, looked into the history of the criminal law and concluded that "[i]nsanity did not come to be generally recognized as an affirmative defense and an independent ground for acquittal until the nineteenth century," and that the insanity defense owed its existence to the older concept of *mens rea*. *Korell*, 213 Mont. at 329, 690 P.2d at 999. The court concluded that the *mens rea* doctrine was responsible for the earliest manifestations of the insanity defense, in that any ancient criminal legal precepts regarding the mentally ill were founded on the idea that "one who lacks the requisite criminal state of mind may not be convicted or punished." *Id.* Thus, the Montana Supreme Court, and now the majority of this Court, conclude that as long as there is an opportunity for the defendant to disprove the intent to do the act, the Constitution is not offended by the absolute abolition of the insanity defense. I cannot agree.

It is certainly true that the insanity defense and the doctrine of *mens rea* both address the identical concern of criminal culpability. However, that fact does not merge the one concept into the other. It is misleading to look back into the dark ages of English history and declare that according to present standards of human knowl-edge a particular concept was not sufficiently defined to be recognizable today. In tracing the history of the insanity defense, I believe it is evident that the insanity defense has an independent existence of sufficient duration and significance to entitle it to a place in our American concept of "ordered liberty."

For the above stated reasons, I do not believe that the majority opinion has demonstrated adequate authority for its conclusion that the insanity defense is not required by Fourteenth Amendment due process guarantees of the United States Constitution.

The next logical question to be answered is whether there is adequate authority to conclude that the defense is required by due process.

The test of due process has been variously stated over the years. In *Hebert v. Louisiana*, 272 U.S. 312, 316–17, 47 S.Ct. 103, 104, 71 L.Ed. 270 (1926), the United States Supreme Court held that due process requires that state action to be "consistent with the fundamental principles of liberty and justice which lie at the base of all our civil and political institutions and not infrequently are designated as 'law of the land.'"

In *Palko v. Connecticut*, 302 U.S. 319, 324–25, 58 S.Ct. 149, 151–52, 82 L.Ed. 288 (1937), Justice Cardozo wrote that those particulars of the Bill of Rights which must be held to apply as against the States through the Fourteenth Amendment Due Process Clause are those which "have been found to be implicit in the concept of ordered liberty, ..." such that "a fair and enlightened system of justice would be impossible without them."

In another case, Cardozo further explained the implications of the phrase "due process" in holding that the state:

[I]s free to regulate the procedure of its courts in accordance with its own conception of policy and fairness, unless in so doing it offends some principle of justice so rooted in the traditions and conscience

of our people as to be ranked as fundamental.

*Snyder*, 291 U.S. at 105, 54 S.Ct. at 332.

*Malinski v. New York*, 324 U.S. 401, 413–14, 65 S.Ct. 781, 787, 89 L.Ed. 1029 (1945) (Frankfurter, J., concurring), held that:

> The safeguards of "due process of law" ... summarize the history of freedom of English-speaking peoples running back to the Magna Carta and reflected in the constitutional development of our people.... [Due process of law] expresses a demand for civilized standards of law.

Justice Frankfurter went on to state that:

> "Judicial review of that guaranty of the Fourteenth Amendment inescapably imposes upon this Court an exercise of judgment upon the whole course of the proceedings in order to ascertain whether they offend those canons of decency and fairness which express the notions of justice of English-speaking peoples even toward those charged with the most heinous offenses.... The judicial judgment in applying the Due Process Clause must move within the limits of accepted notions of justice...."

*Id.*, 324 U.S. at 416–17, 65 S.Ct. at 789.

*Duncan v. Louisiana*, 391 U.S. 145, 149, 88 S.Ct. 1444, 1447, 20 L.Ed.2d 491 (1968), in evaluating the place of trial by jury in the Due Process Clause, delineated due process rights as those which are "fundamental to the American scheme of justice, ..."

The underlying theme of these various formulations of "due process" is a sense of historical precedent upon which American institutions were founded and our continuing legal traditions. Thus, the proper focus in evaluating the place of a particular doctrine in the concept of due process is the pervasiveness of the doctrine in the history of the common law. A review of the extensive history of the insanity defense in the law of England and the United States leads to the conclusion that due process does require the availability of that defense to criminal defendants.

The insanity defense existed as an excuse to crime by the time of the reign of Edward I (1272–1307). III Holdsworth, *A History of English Law*, 371 (1908) (hereinafter III Holdsworth); Glueck, *Mental Disorder and the Criminal Law*, 125 (1927) (hereinafter Glueck); Biggs, *The Guilty Mind*, 83 (1955) (hereinafter Biggs). During the reign of Edward II (1307–1321), there was a shift toward recognizing insanity as a complete defense, which was perfected by the time of the ascension of Edward III to the throne (1326–1327). *Id.* The early form of the defense was a special verdict of madness, which entitled the defendant to acquittal by the King. *Id.*

Bracton, writing in approximately 1265 A.D., is praised as the first commentator to compile "by far the most comprehensive ... account of the law of England, written from the very origin of the system down to Blackstone's *Commentaries*, ..." Stephen, *History of the Criminal Law of England*, 199 (1883). He is credited with supplying two of the earliest definitions of insanity in the context of civil liability, the "knowledge" test and the "wild beast" test, which later influenced the conceptual evolution of the criminal law: "A 'madman' (*furious*), he said, is one who does not know what he is doing, who lacks in mind and reason (*animo et ratione*), and who is not far removed from the brutes (*et non multum distat a brutis*)." Glueck at 126, quoting *De Legibus et Consuetudinibus Angliae*, (Sir Travers Twiss, ed. 1878). Although this quotation is not made in the context of criminal responsibility, his words were widely used in other writings and judicial opinions. Biggs at 83.

By 1581, the lack of criminal responsibility of the insane appears to be well established, for in that year a standard reference book by William Lambard was printed, and was reprinted at least seven times before 1610, which set forth a test of criminal responsibility to be applied by the courts:

> If a mad man or a naturall foole, or a lunatike in the time of his lunacie, or a childe y apparently hath no knowledge of good nor euil do kil a ma[n], this is no felonious acte, nor anything forfeited by it ... for they canot be said to haue any

understanding wil. But if upo[n] examinatio[n] it fal out, y they knew what they did, & [that] it was ill, the[n] seemeth it to be otherwise.

Biggs at 83–84, quoting Lambard, *Eirenarcha or of the Office of the Justices of the Peace* at Cap. 21.218.

Fitzherbert was another commentator who offered a test of insanity in the early sixteenth century, defining an insane person as "such a person who cannot account or number twenty pence, nor can tell who was his father or mother, nor how old he is, etc., so as it may appear he hath no understanding of reason what shall be for his profit, or what for his loss." Glueck at 128.

Coke, in a commentary on the works of Littleton, wrote that:

[I]n criminal causes, as felonie, etc., the act and wrong of a madman shall not bee imputed to him, for that in those causes, *actus non facit reum, nisi mens sit rea,* and he is *amens (id est), sin mente,* without his mind or discretion; and *furious solo furore punitir,* a madman is only punished by his madnesse.

Glueck, at 130, quoting Coke, *Littleton,* Bk. II, § 247b.

In 1630 another standard reference work was published for use by Justices of the peace. Although it was best known as the definitive legal authority on witchcraft, it also iterated the principle that:

If one that is *Non compos mentis,* or an ideot, kill a man, this is no felonie; for they haue not knowledge of good or euill nor can have a felonious intent, nor a will or minde to do harme: ...

Biggs at 87, quoting Dalton, *The Country Justice,* 244 (1630).

Hale (1609–1676), who served as Lord Chief Justice of the Court of the King's Bench, is credited with the advocating a rational approach to insanity for the first time in English law by elucidating the relationship of insanity to the "ethical fundamentals of the criminal law":

Man is naturally endowed with these two faculties, understanding and liberty of will, and therefore is a subject properly capable of a law properly so called, and consequently obnoxious to guilt and punishment for the violation of that law, which in respect of these two great faculties he hath a capacity to obey: The consent of the will is that, which renders human actions either commendable or culpable; as where there is no law, there is no transgression, so regularly where there is no will to commit an offense, there can be no transgression, or just reason to incur the penalty or sanction of that law instituted for the punishment of crimes or offenses. *And, because the liberty or choice of the will presupposeth an act of the understanding to know the thing or action chosen by the will, it follows that, where there is a total defect of the understanding, there is no free act of the will on the choice of things or actions.*

Hale, *Pleas of the Crown,* Vol. I, pp. 13, 15, quoted in Glueck at 132. (emphasis added).

Hale then proceeded to discuss the definition of insanity, classifying it as an accidental defect which may disprove criminal intent. He set forth the test of Fitzherbert, the so-called "twenty pence" test, but concludes that although pre-defined tests may provide evidence of insanity, it is ultimately a question for the jury as to whether a defendant is too mentally ill to be found culpable for criminal acts. It is this passage which causes Glueck to credit Hale with enlightenment on the issue, even though the remainder of Hale's discussion is hampered by an understanding of psychology rooted in superstition and scientific ignorance. For example, Hale distinguishes between permanent and temporary insanity, defining the latter as that type of insanity which is influenced by the phases of the moon.

Hawkins was the next significant commentator on the law of insanity, writing in the late eighteenth century. He wrote that, "[t]he Guilt of offending against any Law whatsoever, necessarily supporting a wilful disobedience, can never justly be imputed to those who are either uncapable of understanding it, or of conforming themselves to it:" Hawkins, *A Treatise of the Pleas of the Crown* Vol. I, p. 1 (1724).

Hawkins proceeded to elaborate a test for criminal responsibility which heavily influenced the development of the "right-wrong" test still utilized today. He states: "Those who are under a natural Disability of Distinguishing between Good and Evil, as Infants under the Age of Discretion, Ideots and Lunaticks, are not punishable by criminal Prosecution whatsoever." Hawkins at p. 2.

In addition to the records created by the early commentators, there is also recorded case law on the subject. In *Rex v. Arnold*, 16 How.St.Tr. 695 (1724), there was evidence to show that the defendant's act was the result of an insane delusion. Judge Tracy's charge to the jury in that case provided precedent for the use of the "wild beast" test, although Glueck points out that the phrase was only one element of a lengthy instruction which set forth many different formulations of the issue. The instruction was as follows:

> If the man be deprived of his reason, and consequently of his intention, he cannot be guilty.... It is not every kind of frantic humor or something unaccountable in a man's actions, that points him out to be such a madman as is to be exempted from punishment; it must be a man that is totally deprived of his understanding and memory, and doth not know what he is doing, no more than an infant, than a brute, or a wild beast, such a one is never the object of punishment. I must leave it to your consideration, whether the condition this man was in, as it is represented to you on one side, or the other, doth shew a man, who knew what he was doing, and was able to distinguish whether he was doing good or evil, and understood what he did.... If you believe he was sensible and had the use of his reason, and understood what he did, then he is not within the exemptions of the law, but is subject to punishment as any other person.

*Id.* at 764–65, quoted in Glueck at 139, note 2.

In *Earl Ferrer's Case*, 19 How.St.Tr. 886, 948 (1760), the prosecution accepted the notion of an insanity defense in a trial before the House of Lords, arguing for the "right and wrong" test as the appropriate standard. That standard later gained wide acceptance, though other definitions continued to be aired. In *Hadfields Case*, 27 How.St.Tr. 1282 (1800), for example, it was successfully argued by Lord Erskine that the connection of the criminal act to a delusion suffered by the defendant should result in acquittal. Twelve years later, Lord Chief Justice Mansfield in *Bellingham's Case*, cited in *Collinson on Lunacy* at 671 (1812), quoted in Biggs at 90–91, stated the law of insanity as follows:

> If a man were deprived of all power of reasoning, so as not to be able to distinguish whether it was right or wrong to commit the most wicked transaction, he could not certainly do an act against the law. Such a man, so destitute of all power of judgment, could have no intention at all. In order to support this defense, however, it ought to be proved by the most distinct and unquestionable evidence, that the criminal was incapable of judging between right and wrong. It must, in fact, be proven beyond all doubt, that at the time he committed the atrocious act with which he stood charged, he did not consider that murder was a crime against the laws of God and nature.

This instruction is substantially similar to that given later in *Offord's Case*, 5 Car. and P. 168 (1831), cited in Glueck at 151. And in *Regina v. Oxford*, 9 Car. and P. 525 (1840), the trial judge charged the jury that:

> The question is whether the prisoner was labouring under that species of insanity which satisfies you that he was quite unaware of the nature, character and consequences of the act he was committing, or, in other words, whether he was under the influence of a diseased mind, and was really unconscious at the time he was committing the act, that it was a crime.

*Id.* at 537.

Elsewhere, the jury was charged that it should inquire "whether the evidence given proves a disease of the mind as of a person

quite incapable of distinguishing right from wrong." *Id.* at 547.

In 1812 two other cases were tried in England, *Parker's Case,* and *Bowler's Case.* In *Bowler's Case,* Justice LeBlanc charged the jury that:

> [I]t was for them to determine whether the Prisoner when he committed the offence ... was or was not incapable of distinguishing right from wrong, or under the influence of any illusion in respect of the prosecutor which rendered his mind at the moment insensible of the nature of the act he was about to commit, since in that case he would not be legally responsible for his conduct.

Biggs at 92, quoting *Collinson on Lunacy* at 673.

American case law followed the development of the English cases and commentators in the rare instances that insanity was pleaded as a defense to crimes up until the holding in *M'Naughten's Case,* 8 Eng.Rep. 718 (H.L.1843). Glueck at 154, notes two early American cases which substantially represent the law as it existed in the United States up to that time, *In re Clark* 1 City Hall Recorder (N.Y.) 176 (1816), and *In re Ball,* 2 City Hall Recorder (N.Y.) 85 (1817). Glueck also cites *United States v. Clarke,* 25 F.Cas. (14811) 454, 2 Cranch. C.C. 158 (1818); and *Pienovi's Case,* 3 City H. Recorder (N.Y.) 123 (1818) as other early United States cases involving insanity. Glueck at 156.

The jury in *In re Clark* was instructed pursuant to the "right and wrong" concept of insanity that:

> [I]t is not every degree of madness or insanity, which abridges the responsibility attached to the commission of a crime. —In that species of madness, where the prisoner has lucid intervals; if during those intervals, and when capable of distinguishing good from evil, he perpetrates an offence, he is responsible. The principal subject of inquiry, therefore, in this case, is, whether the prisoner, at the time he committed this offence, had sufficient capacity to discern good from evil. —Should the jury believe he had such

capacity, it would be their duty to find him guilty.

Quoted in Glueck at 154.

And in *In re Ball,* the jury was likewise instructed that upon the defense of insanity, "[t]he only question on the part of this case is, whether, at the time he committed the offence, he was capable of distinguishing good from evil?" *Id.* at 155.

At last, in 1843, the case of *M'Naughten* was decided, leaving an indelible mark upon the law of insanity in both England and the United States. Due to public outcry resulting from the fame of the victim and the acquittal of the defendant in that case, the House of Lords requested an opinion from the Justices on the state of the insanity defense in the law. Because of the hypothetical nature of the questions put to the Justices by the House of Lords, the precedential authority of their answers is in doubt. For the same reason, the judges were cautious in framing their answers, with the result that their conclusions are vague and contradictory. Biggs at 107–08. Nevertheless, the answers represented the opinion of England's justices on the contemporary state of the law of insanity, and the formulation of the insanity defense since 1843 in England and the United States is founded upon those answers. Stephen, *History of the Criminal Law of England* 154 (1883). Thus, the first uniform test of insanity is derived from answers to the question of how the issue of insanity ought to be presented to a jury; the response was that "it must be clearly proved that, at the time of committing the act, the party accused was labouring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing, or if he did know it that he did not know he was doing what was wrong." Answers of the Justices to Questions II and III, quoted in Glueck at 179.

There have been many cases in early American legal history addressing the issue of insanity as a criminal defense since *M'Naughten,* cases which are better characterized by their inconsistency than any

degree of uniformity.[10] However, the appropriateness of the defense has rarely been questioned, and only a few American jurisdictions have ever attempted to eliminate the concept from their criminal justice systems.

There were three legislative attempts to abolish the insanity defense between 1910 and 1931. Each of those legislative enactments were overturned by the respective state Supreme Courts. The Montana Supreme Court, in its recent decision upholding the 1979 abolition of the defense in Montana, effortlessly distinguished those three cases because "[t]hey interpret statutes that precluded *any* trial testimony of mental condition, including that which would cast doubt on the defendant's state of mind at the time he committed the charged offense." *Korell*, 213 Mont. at 329, 690 P.2d at 999 (emphasis in original). The *Korell* court felt that Montana's allowance for psychiatric evidence going to the issue of *mens rea* at trial removed any precedential value from those three prior cases. However, I believe that two of those cases have greater applicability to the issues faced in *Korell* and by this Court than the Montana Supreme Court would allow.

In *State v. Strasburg*, 60 Wash. 106, 110 P. 1020 (1910), the statute at issue did not explicitly forbid any psychiatric evidence going to the issue of *mens rea*. Rather, the statute merely provided that no evidence could be admitted to prove that at

---

**10.** Cases addressing the right and wrong test of insanity: *State v. Shippey*, 10 Minn. 223 (1865); *Flanagan v. People*, 52 N.Y. 467 (1873); *Cunningham v. State*, 56 Miss. 269 (1879); *Guiteau's Case*, 10 F. 161 (D.C.Cir.1882); *State v. Mowry*, 37 Kan. 369, 15 P. 282 (1887); *State v. Alexander*, 30 S.C. 74, 8 S.E. 440 (1889); *State v. Zorn*, 22 Or. 591, 30 P. 317 (1892); *State v. Harrison*, 36 W.Va. 729, 15 S.E. 982 (1892); *State v. O'Neil*, 51 Kan. 651, 33 P. 287 (1893); *State v. Hartley*, 22 Nev. 342, 40 P. 372 (1895); *Knights v. State*, 58 Neb. 225, 78 N.W. 508 (1899); *People v. Methever*, 132 Cal. 326, 64 P. 481 (1901); *Maas v. Territory*, 10 Okla. 714, 63 P. 960 (1900); *State v. Knight*, 95 Me. 467, 50 A. 276 (1901); *Schwartz v. State*, 65 Neb. 196, 91 N.W. 190 (1902); *People v. Silverman*, 181 N.Y. 235, 73 N.E. 980 (1905); *Turner v. Territory*, 15 Okla. 557, 82 P. 650 (1905); *State v. Wetter*, 11 Idaho 433, 83 P. 341 (1905); *People v. Willard*, 150 Cal. 543, 89 P. 124 (1907); *Duthey v. State*, 131 Wis. 178, 111 N.W. 222 (1907); *State v. Paulsgrove*, 203 Mo. 193, 101 S.W. 27 (1907); *Smith v. State*, 95 Miss. 786, 49 So. 945 (1909); *State v. Maioni*, 78 N.J.L. 339, 74 A. 526 (1909); *People v. Carlin*, 194 N.Y. 448, 87 N.E. 805 (1909); *State v. Brown*, 36 Utah 46, 102 P. 641 (1909); *State v. Craig*, 52 Wash. 66, 100 P. 167 (1909); *Oborn v. State*, 143 Wis. 249, 126 N.W. 737 (1910); *State v. Hassing*, 60 Or. 81, 118 P. 195 (1911); *State v. Jackson*, 87 S.C. 407, 69 S.E. 883 (1911); *State v. Riddle*, 245 Mo. 451, 150 S.W. 1044 (1912); *People v. Ashland*, 20 Cal.App. 168, 128 P. 798 (1912); *State v. English*, 164 N.C. 497, 80 S.E. 72 (1913); *People v. Harris*, 169 Cal. 53, 145 P. 520 (1914); *People v. Bundy*, 168 Cal. 777, 145 P. 537 (1914); *Bond v. State*, 129 Tenn. 75, 165 S.W. 229 (1914); *Perkins v. U.S.*, 228 F. 408 (1915); *State v. Anselmo*, 46 Utah 137, 148 P. 1071 (1915); *People v. Schmidt*, 216 N.Y. 324, 110 N.E. 945 (1915); *State v. Clancy*, 38 Nev. 181, 147 P. 449 (1915); *State v. Cooper*, 170 N.C. 719, 87 S.E. 50 (1915); *State v. Alie*, 82 W.Va. 601, 96 S.E. 1011 (1918); *Hall v. State*, 78 Fla. 420, 83 So. 513 (1919); *People v. Williams*, 184 Cal. 590, 194 P. 1019 (1920); *State v. Miller*, 225 S.W. 913 (Mo.1920); *McNeill v. State*, 18 Okla.Crim. 1, 192 P. 256 (Okla.1920); *State v. Bramlett*, 114 S.C. 389, 103 S.E. 755 (1920); *State v. Weagley*, 286 Mo. 677, 228 S.W. 817 (1921); *State v. Carrigan*, 94 N.J.L. 566, 111 A. 927 (1921); *Lautario v. State*, 23 Ariz. 15, 201 P. 91 (1921); *Kraus v. State*, 108 Neb. 331, 187 N.W. 895 (1922); *Swann v. State*, 92 Tex.Crim.Rep. 153, 242 S.W. 735 (1922); *Craven v. State*, 93 Tex. Crim.Rep. 328, 247 S.W. 515 (1923).

Cases addressing the "irresistible impulse" test: *Commonwealth v. Rogers*, 48 Mass. (7 Met.) 500 (1844); *Commonwealth v. Mosler*, 4 Pa. 264 (1846); *State v. Felter*, 25 Iowa 67 (1868); *Blackburn v. State*, 23 Ohio 146 (1872); *State v. Johnson*, 40 Conn. 136 (1873); *People v. Finley*, 38 Mich. 482 (1878); *Boswell v. State*, 63 Ala. 307 (1879); *Dejarnette v. Commonwealth*, 75 Va. 867 (1881); *Parsons v. State*, 81 Ala. 577, 2 So. 854 (1886); *Williams v. State*, 50 Ark. 511, 9 S.W. 5 (1888); *Taylor v. United States*, 7 App.D.C. 27 (1895); *Commonwealth v. Gilbert*, 165 Mass. 45, 42 N.E. 336 (1895); *Carr v. State*, 96 Ga. 284, 22 S.E. 570 (1895); *State v. Peel*, 23 Mont. 358, 59 P. 169 (1899); *State v. McCullough*, 114 Iowa 532, 87 N.W. 503 (1901); *Doherty v. State*, 73 Vt. 380, 50 A. 1113 (1901); *State v. Jack*, 20 Del. 470, 58 A. 833 (1903); *State v. McGruder*, 125 Iowa 741, 101 N.W. 646 (1904); *State v. Lyons*, 113 La. 959, 37 So. 890 (1904); *Territory v. Kennedy*, 15 N.M. 556, 110 P. 854 (1910); *Hall v. Commonwealth*, 155 Ky. 541, 159 S.W. 1155 (1913); *Ryan v. People*, 60 Colo. 425, 153 P. 756 (1915); *Flanders v. State*, 24 Wyo. 81, 156 P. 39 (1916); *People v. Lowhone*, 292 Ill. 32, 126 N.E. 620 (1920); *Morgan v. State*, 190 Ind. 411, 130 N.E. 528 (1921).
See also *State v. Pike*, 49 N.H. 399 (1870); *Hardy v. Merrill*, 56 N.H. 227 (1875).

the time of the commission of the crime the defendant "was unable, by reason of his insanity, idiocy or imbecility, to comprehend the nature and quality of the act committed, or to understand that it was wrong; or that he was afflicted with a morbid propensity to commit prohibited acts." *Strasburg*, 60 Wash. at 111–12, 110 P. at 1021.

In analyzing the statute and concluding that it was an unconstitutional deprivation of the right to jury trial, the *Strasburg* Court considered the test of what constituted the right to jury trial as that which "existed in the territory at the time when the Constitution was adopted." *Strasburg*, 60 Wash. at 115, 110 P. at 1022. In applying that test, the Court went through a lengthy analysis of the state of the insanity defense in the history of the common law. Some of the early authorities cited discussing the insanity defense, as noted by the *Korell* Court, could equally apply to the parallel concept of *mens rea*. However, there are other authorities cited in *Strasburg* which speak to the question of whether, in having the intent to commit an act, the defendant had the concurrent ability to distinguish between right and wrong, or the ability to control the action, such that "he is not a responsible moral agent and is not punishable for criminal acts." *Id.*, citing *Commonwealth v. Rogers*, 48 Mass. (7 Metc.) 500, 41 Am.Dec. 458 (1944).

The Court concluded that "it seems too plain for argument that one accused of a crime had the right prior to and at the time of the adoption of our Constitution to show as a fact in his defense that he was insane when he committed the act charged against him." Therefore, I do not believe that the rationale of the *Strasburg* holding may be interpreted as need for *mens rea* alone.

*Sinclair v. State*, 161 Miss. 142, 132 So. 581 (1931), also speaks of insanity in terms broader than mere intent:

> Insanity to the extent that the reason is totally destroyed so as to prevent the insane person from knowing right from wrong, or the nature and probable consequence of his act, has always been a complete defense to all crimes from the earliest ages of the common law. The common law proceeds upon an idea that before there can be a crime there must be an intelligence capable of comprehending the act prohibited, and the probable consequence of the act, and that the act is wrong. Shall such an insane person be branded with the stigma of felony when he was wholly unable to comprehend the nature and quality of the act designated, and is it competent for the Legislature to make an act a felony and brand the person with the stigma of disgrace under such circumstances?

*Sinclair*, 161 Miss. at 158, 132 So. at 583 (Ethridge, J., specially concurring).

In analyzing the statute in question under the due process requirements of the federal Constitution, the Court found several deficiencies, only one of which was the fact that the statute had the effect of presuming the element of intent in a criminal trial. The Court also found that there was no rational relationship to any legitimate government purpose in abolishing the defense. In addition, the Court concluded that the law violated due process because it had procedural deficiencies. Under the statute a judge had the power to make an unappealable determination (of insanity after conviction) without a hearing or any burden of proof. This decision would determine whether the convicted defendant would be incarcerated in a penitentiary or in a facility for the mentally ill. For all these reasons the statute was held to violate due process.

And in applying the principles of the Eighth Amendment's prohibition against cruel and unusual punishment, the *Sinclair* Court noted the longstanding and fundamental nature of the insanity defense throughout the common law in the strongest terms. *Id.* at 584, 132 So. 581.

The third instance of attempted abolition of the insanity defense occurred in Louisiana, and was overturned in *State v. Lange*, 168 La. 958, 123 So. 639 (1929). In that case, the statute was struck down on state constitutional grounds. That decision is therefore not relevant to the federal constitutional issue we face today.

Another, albeit less authoritative, test of whether a particular doctrine is "implicit in the concept of ordered liberty" other than the history of the legal concept, is the unanimity with which the doctrine is adopted among American jurisdictions. With the exception of the three attempted legislative abolitions of the insanity defense noted above, and the recent rejections of the defense in Montana (1979), Idaho (1982) and Utah (1983), the insanity defense has been universally accepted in all American jurisdictions throughout this nation's history. These legislative judgments are not the sole test of which concepts are "fundamental" to our system of jurisprudence, but as the Supreme Court has noted in the context of judging "evolving standards of decency" under the Eighth Amendment, such legislation is "an objective indicator of contemporary values upon which we can rely." *Penry v. Lynaugh,* 492 U.S. 302, ___, 109 S.Ct. 2934, 2955 106 L.Ed.2d 256 (1989). There has not been universal acceptance of one particular test of insanity, and the burden of proof of the defense is variously allocated in different jurisdictions. See *American Bar Association Policy on the Insanity Defense,* Standing Committee of Association Standards for Criminal Justice and Commission on the Mentally Disabled (February 9, 1983), Appendix One. However, this fact is adequately accounted for by the difficult and changing nature of the subject matter and the inherent authority of the States to define their criminal laws as they see fit within the limits of the federal Constitution.

As the United States Supreme Court has not addressed this issue directly, I must also resort to indirect analogies from that Court's decisions in order to support the contention that due process requires an insanity defense in criminal cases.

In *Penry,* the issue was whether the Eighth Amendment rule against cruel and unusual punishment prohibited the execution of a mentally retarded defendant. In the course of its opinion, the Court examined the treatment of the retarded and insane in the common law, and concluded that the early authorities which formed the

foundation of the modern insanity defense, including those cited above, constituted a "common law prohibition against punishing 'idiots' for their crimes." *Id.,* 492 U.S. at ___, 109 S.Ct. at 2954. Nevertheless, the Court ultimately concluded that there was no bar to the execution of Penry. The central rationale was that there were other screening mechanisms in place in the criminal justice system which would measure the mental competence and related culpability of the accused. The Court reasoned that "[b]ecause of the protections afforded by the insanity defense today, such a person is not likely to be convicted or face the prospect of punishment." *Id.* Thus, if the trier of fact rejected an insanity defense as to the defendant's mental condition at the time of the crime, which would constitute an implicit finding of culpability, then there was no reason to distinguish the defendant with a lesser intelligence quotient from other defendants in defining an applicable range of sentencing alternatives. The rule of *Penry* cannot apply in jurisdictions that lack an insanity defense; otherwise there would exist the danger of imposing capital punishment against the mentally incompetent, in violation of the Eighth Amendment.

Also relevant is the Supreme Court case of *Leland v. Oregon.* That case, in conjunction with the holdings of *In re Winship* and *Martin v. Ohio,* belie the argument advanced by the Montana Supreme Court in *Korell* that due process is satisfied as long as some element of *mens rea* is preserved in the process of the abolition of the insanity defense. Those three cases, read together, establish that the issues of *mens rea* and insanity are not one and the same.

As noted previously, the United States Supreme Court in *Winship* held that due process requires the prosecution to prove every element of the crime charged beyond a reasonable doubt. However, that holding would not apply to affirmative defenses, as they are not considered to be an element of the crime. Rather, affirmative defenses are generally categorized as excuse or justification for the crime, so that even though all of the elements of the crime be proven,

the accused may avoid conviction. In *Leland*, the Court characterized the issue of insanity as a defense in the course of holding that the burden of proof to prove insanity could be placed on the defendant. *Patterson* and *Martin* confirmed this interpretation of *Winship*.

Under the rules enunciated in those cases, if the insanity defense is no more than an issue of whether the defendant entertained the necessary *mens rea* to commit the crime, then the holding of *Leland* must fall, and the prosecution must bear the burden of proving the sanity of every defendant. For *Leland* and *Winship* to exist in harmony under such an interpretation, it would have to be concluded that the state could define all crimes in such a way as to eliminate the requirement of *mens rea* as an element of the crime, characterize a lack of intent as an affirmative defense, and thus shift the burden of proof to the defense to prove that there was no intent to commit the act charged. It is my belief that such a reading of the Supreme Court's holdings in this area is too strained to merit serious consideration.

The idea that due process is satisfied by allowing the defendant to produce psychiatric evidence in order to negate criminal intent ignores the historical rationale for the defense. "The issue of criminal blameworthiness merits deeper inquiry [than whether the defendant harbored the requisite *mens rea* for the offense] because it implies a certain *quality* of knowledge and intent transcending a minimal awareness and purposefulness." ABA Criminal Justice Mental Health Standards at 337 (1984) (emphasis in original).

This idea is supported by the historical development of the insanity defense in conjunction with the parallel evolution of *mens rea*. The development of the law of homicide is a case in point. While in the 13th century insanity made one eligible for royal pardon for the offense of homicide, it was not until the year 1389 that there was acknowledgement of differing levels of culpability in homicide. In that year the decree of 13 Richard II, declaring killing done with "malice prepense" ineligible for royal

pardon, constituted "the first statutory recognition of the expression 'malice aforethought.'" Sayre, *Mens Rea*, 45 Harvard L.Rev. 974, 996 (1931). It was not until the period between 1496–1547 that homicides were classified under the law according to differing levels of culpability. *Id.* at 996–97.

There would have been no need for the development of the insanity defense if it had been merely a variant formulation of the *mens rea* doctrine. While *mens rea* is concerned with the guilty mind, the defense of insanity questions whether the guilty mind with which the act is done is a product of voluntary and rational choice. "The conception of blameworthiness or moral guilt is necessarily based upon a free mind voluntarily choosing evil rather than good; there can be no criminality in the sense of moral shortcoming if there is no freedom of choice or normality of will capable of exercising a free choice." *Id.* at 1004.

Based upon all of the foregoing authority, I must dissent from the majority's conclusion that the abolition of the insanity defense does not amount to the deprivation of due process under the United States Constitution. As I have concluded that the federal Constitution requires the availability of the insanity defense, I do not address the question of the status of the defense under the Idaho State Constitution.