849 P.2d 969

**STATE of Idaho, Plaintiff–Respondent,**

v.

**Shawn W. KERRIGAN, Defendant– Appellant.**

**No. 19560.**

Court of Appeals of Idaho.

March 29, 1993.

Petition for Review Denied April 23, 1993.

Whittier, McDougall, Souza, Murray & Clark, Chartered; Pocatello, for appellant. Isaac E. McDougall argued.

Larry EchoHawk, Atty. Gen., Michael Henderson, Deputy Atty. Gen., Boise, for respondent. Michael Henderson argued.

WALTERS, Chief Judge.

This is primarily a sentence review. The appellant, Shawn W. Kerrigan, was charged with four felonies: aggravated battery, use of a firearm in the commission of a crime, battery upon a police officer, and possession of stolen property, as a result of his shooting of an Idaho State Police officer who had stopped Kerrigan on the highway. Kerrigan pled guilty to the first three charges and the charge of possessing stolen property was dismissed. The court imposed a sentence consisting of a determinate period of confinement of forty years, to be followed by an indeterminate period of five years. Kerrigan asserts that the sentence is excessive. He also argues that the court erred when it allowed two state law enforcement officers to testify at the sentencing hearing regarding the effect the shooting had on the state police force. We affirm.

The facts in this case may be stated briefly. On June 15, 1991, Kerrigan was speeding along Interstate 84 in a car stolen from his girlfriend in Wisconsin. Idaho State Police Officer Steven Hobbs, driving a marked patrol car, stopped Kerrigan. When the officer approached Kerrigan's car on foot, Kerrigan shot at him four times with a nine millimeter pistol. Three of the bullets hit the officer. Kerrigan sped away. Officer Hobbs tried to chase him in his car, but drove off the road after falling unconscious. Kerrigan drove a little farther along the freeway to a nearby rest stop, abandoned his car, and fled on foot into the desert. He was caught the next day. Officer Hobbs was severely and permanently injured by the shooting.

Kerrigan admitted the shooting, a complaint was filed, and he soon pled guilty. At the sentencing hearing, the court heard comments from both sides and imposed the following sentence: for aggravated battery, I.C. § 18–907(a), fifteen years confinement; because the battery was upon a police officer, the sentence was doubled to thirty years under I.C. § 18–915; for use of a deadly weapon in commission of a crime, I.C. § 19–2520, the sentence was enhanced by another consecutive fifteen-year period. The total sentence imposed, forty-five years, equals the maximum aggregate penalty allowed by the statutes. The court specified, however, that the first forty years be served without possibility of parole, and that the last five years be indeterminate. Kerrigan recognizes that the sentence is within the range allowed by the pertinent statutes. He argues, however, that the sentence does not fit his circumstances. He also challenges the relevancy of the testimony of the two state police officers. We address the latter issue first.

## I

Over defense counsel's objection, the court allowed Officers Ronald Moore and Glen Schwartz to testify at the sentencing hearing. Officer Moore, chief administrator and deputy director of the Idaho Department of Law Enforcement, has the responsibility of assessing the morale of the state police. He reported that several officers, dispatchers, and others requested and received counselling for post-traumatic stress after the shooting. He also testified regarding the cost of disability and retraining of Officer Hobbs. Officer Schwartz, deputy district commander for the Twin Falls district of the state police, the district where the shooting took place, testified that the shooting had made the officers in his unit more cautious, and that the public relations role they assumed before had changed. The perception now is that every police/citizen encounter must be approached with suspicion because it could present a risk of serious injury or death to the officer. Kerrigan's counsel was able to cross-examine these witnesses. Counsel contended at the hearing, and now on this appeal, that the testimony was not probative and provided nothing to help the court determine Kerrigan's sentence.

The sentencing court has broad discretion in determining what evidence to admit at a sentencing hearing. *State v. Johnson,* 101 Idaho 581, 618 P.2d 759 (1980). Idaho Code § 19–5306, which enumerates specific rights of the victim in the investigation or prosecution of a criminal case, provides statutory support for a broad-based inquiry during sentencing. *State v. Bivens,* 119 Idaho 119, 803 P.2d 1025 (Ct.App.1991). The rules of evidence which govern the presentation or application of information in other proceedings do not apply at sentencing hearings, except insofar as the rules address privileged communications. I.R.E. 101(e)(3). The sentencing judge is presumptively able to ascertain the relevancy and reliability of the broad range of information and material which may be presented during the sentencing process, and to disregard that which is irrelevant and unreliable. *State v. Johnson, supra.*

To support the officers' testimony, the state characterizes the police force and its members as victims of the shooting, or alternatively, as members of Officer Hobbs' "community or family." The state argues that receiving the officers' testimony was proper because the testimony constituted "victim impact statements" from representatives of the force. The use of victim impact statements in non-death penalty cases has been upheld in *State v. Searcy,* 118 Idaho 632, 798 P.2d 914 (1990).

It is obvious that the unprovoked shooting of a state police officer in what should have been a routine traffic stop would send shock waves through the police force, especially in the officer's home district. The shock could, and apparently did, take its mental and physical toll on those who dealt with the crime or who knew Officer Hobbs. At the same time, the unexpected attack on the officer, in common sense terms, apparently made the members of the district realize that their once relatively peaceful enclave had become, in a few seconds, part of the regrettable trend towards arbitrary acts of violence. Thus, greater precautions

to ensure officer safety are presently seen as necessary, and the force must spend more money to protect officers now and in the future. Moreover, there is the very tangible cost of trying to treat the physical injuries suffered by Officer Hobbs and, in a less direct sense, the mental harm suffered by others.

Kerrigan does not challenge the state's characterization of the testimony, but simply argues that the information was not relevant. Although we are sensitive to the impact the shooting had on the police force, we do not find it necessary to determine whether the Idaho State Police, and its members who worked with Officer Hobbs, can be described as victims or members of Officer Hobbs' "family." Instead, we consider the information to be probative simply based on Officer Hobbs' status as a state police officer. The court did not articulate what weight, if any, it accorded Officers Moore's and Schwartz' testimony. However, when considering Kerrigan's motion to exclude the testimony, the judge commented on the public policy surrounding I.C. § 18–915, which increases the penalty for battery if the act is committed upon a police officer:

> I think that the intent of the state legislature in passing that particular statute and enhancing the penalty for violent crimes directly against police officers is obvious and it relates specifically to law enforcement officers in general and their protection, as well as the basic morale. I think given that consideration it demonstrates the relevance of [officers Moore's and Schwartz' testimony] and I feel it would be appropriate ... to go into that area, and I will deny the Motion in Limine.

Section 18–915 confers upon Officer Hobbs a unique status as a member of a group afforded special protection by the legislature. The section provides an elevated penalty for battery upon law enforcement personnel, members of the criminal justice system, social workers, and emergency medical personnel. It is designed to protect those who are charged with preserving the public welfare from those who impair it. Considering a victim's status in a sentencing decision is not a new issue for this Court. In *State v. Bivens*, 119 Idaho 119, 803 P.2d 1025 (Ct.App.1991), the defendant, who had pled guilty to grand theft, asserted that the court erred when it considered the status of the victim as an aggravating factor disallowing probation under I.C. § 19–2521. The victim was the United Way of Magic Valley, from which the defendant had embezzled funds. In *Bivens*, we held that the court's inquiry into the victim's status as a charitable organization was consistent with the purpose and goals of sentencing procedures, based on the fundamental sentencing principle that "a judge may properly conduct an inquiry broad in scope, largely unlimited, either as to the kind of information he may consider or the source from which it may come." *Bivens*, 119 Idaho at 120, 803 P.2d at 1026, *citing State v. Johnson, supra.* Further, we upheld the district judge's position that a lesser sentence would depreciate the seriousness of the crime, and his view that embezzlers from public and charitable institutions must be treated more harshly than embezzlers from private entities in order to restore or retain public confidence in the institutions.

In the instant case, we find no error in the court's consideration of the testimony given by Officers Moore and Schwartz. The information they presented is based on common sense and is easily assimilated as the practical consequences of Kerrigan's act. The shooting of Officer Hobbs had a significant impact on the relatively close-knit community of the Twin Falls district of the state police force. The court did not err when it heard Moore's and Schwartz' testimony, considering the legislative concern for crimes against police officers.

## II

Next we must review Kerrigan's sentence. Sentencing is a matter left to the discretion of the trial court. *State v. Hedger*, 115 Idaho 598, 768 P.2d 1331 (1989). A sentence for a term within the limits prescribed by statute ordinarily will not be considered an abuse of discretion.

*State v. Nice*, 103 Idaho 89, 645 P.2d 323 (1982). However, a sentence may represent an abuse of discretion if it is shown to be unreasonable upon the facts of the case. *Id.* A sentence is reasonable if it appears to accomplish the objective of protecting the good order of society and is imposed to achieve any or all of the related goals of deterrence, rehabilitation or retribution. *State v. Toohill*, 103 Idaho 565, 568, 650 P.2d 707, 710 (Ct.App.1982). A sentence of confinement that is longer than necessary to serve these goals is unreasonable. *Id.* However, because such determinations cannot be made with precision, we will not substitute our view for that of a sentencing judge where reasonable minds might differ, in deference to the discretionary authority vested in Idaho's trial courts. *Id.*

Defense counsel requested a sentence of seven years fixed and ten years indeterminate. He argued that such a sentence would be sufficient for reform and would give Kerrigan "some light at the end of the tunnel." Added to the equation was the knowledge that if Kerrigan did not behave in prison, he would be kept there until he is forty years old, which is when, according to counsel and psychologists, the urge to commit irrational, violent acts "burns out." To support his plea for leniency, Kerrigan argues that he grew up in a stressful, overly disciplined home; he was placed in counselling at age four for hyperactivity and lack of concentration; in 1986, when he was seventeen, he joined the Navy to escape his life at home. He has had little contact with his parents ever since, with a correspondingly small amount of emotional or other kinds of support. Counsel argues that Kerrigan "fell in with a less than desirable crowd," that his criminal history is made up of mostly of property crimes, and that history has not shown him to be a violent person, "but rather [that] he lacks the maturity necessary to function as an adult in society."

Kerrigan was born in the United States in 1968 and was twenty-three years old when he shot Officer Hobbs. His criminal record consists mostly of property crimes committed in England, where he moved with his parents during high school. While there, he was convicted of several counts of theft, obtaining property by deception, burglary, fraud, and "making false instruments." At one time, he was jailed for sixty days for assaulting a man by shooting an air rifle, which is considered a firearm in England, into the man's face. In 1990 he was sentenced to eighteen months in prison for burglary. After the sentence he was recommended for deportation. When he arrived back in the United States in the winter of 1990–91, he went to live in Florida. Within the six to nine months between the time he re-entered the country and when he shot Officer Hobbs, Kerrigan had become a suspect in several crimes in Florida, specifically, two counts of grand theft of a firearm, one count of dealing in stolen property, and five counts of possession of a firearm by a felon. Formal charges had not been filed, however, pending the outcome of Kerrigan's prosecution in Idaho.

Kerrigan's military career reflects a person who does not obey authority. He found the Navy to be an unsuitable branch of the service, and unable to find a way out, he went AWOL several times to prompt his discharge. Unfortunately, he prompted only a court-martial and a sentence in the brig. At one time he forged papers allowing him to travel to England. While in England he visited his family and, interestingly, the Navy recruiter. He was turned in to Naval authorities by his father. In March, 1987, he received an "other than honorable" discharge and became ineligible to re-enlist.

Kerrigan provided the following version of his encounter with Officer Hobbs. As he was travelling on the freeway, he came upon a state patrol car driving in the same direction. When the state vehicle speeded up, Kerrigan accelerated also, thinking that "if he was going to break the speed limit I might as well follow and make the journey quicker." At one point the patrol car slowed, as did Kerrigan, who then sped up and passed the officer. The state patrolman, Officer Hobbs, pulled in behind Kerrigan and activated his overhead lights. During this time, Kerrigan had his pistol

sitting in an unzipped case on the passenger side of the front seat, along with two boxes of ammunition. He immediately pulled over and stopped the vehicle on the side of the highway in response to the officer's actions. Kerrigan watched in the rear view mirror as Officer Hobbs parked his car, remained inside for ten to twenty seconds, and then started walking toward Kerrigan's vehicle. During the same interval, Kerrigan checked the clip in his pistol to make sure it had bullets. When the officer walked up to the car, Kerrigan shot the officer. He then drove to a rest stop, got out of his car, placed the gun on the roof, and waited for the police to arrive. When they did not, he walked into the desert with some clothes and the two boxes of ammunition. He watched the emergency vehicles in the distance tending to Officer Hobbs. He checked his pistol clip again and thought about committing suicide. Unable to kill himself, he walked on, getting rid of the pistol at some point along the way.

Kerrigan explained that he has a lot of anger built up inside him because of his childhood and told the sentencing judge "I always act first before I think, 95 percent of the time." His explanation of the shooting supports this assessment. Kerrigan stated:

> when I saw [Officer Hobbs] walking up next to the car I could have sworn I saw him go for his gun holster, unclip it. You know, I'd just never been stopped by any policeman in the United States or anything like that and I was scared. You know, I did a completely wrong reaction. You know, I'm taking full blame for it. I'm not trying to put it on anything else. It's just that I was scared. I didn't want to get caught. I was driving a stolen car, you know. It's just all those facts, and in a split second, you know, it just happened. You know, the whole incident didn't take longer than, say five or six seconds, you know, maybe even shorter than that.

> \* \* \* \* \* \*

> You know, I didn't strike Officer Hobbs without sufficient cause. I mean, I thought he was going for his gun. You know, people might think, oh, its completely ludicrous, you know, but I don't feel that having a gun stuck in my face, you know, would be very fun at all. You know, I was quite scared, actually.

Both the presentence investigator and the psychologist who conducted Kerrigan's psychological evaluation stated that he showed little remorse for the shooting, and his expressions of regret were unconvincing and formulaic. Questions about his military and criminal past were answered falsely until the interviewer confronted Kerrigan with the facts. His psychological evaluation indicates that he displays an antisocial personality disorder in that he is manipulative, tends to intimidate and exploit others, is suspicious and rebellious toward authority, does not usually fear threats or punitive consequences, and usually does not attach guilt to his inappropriate behavior. He is practiced at the art of deception. According to the record, Kerrigan's personality disorder is the most resistant to treatment known to mental health professionals, particularly given someone with Kerrigan's high level of intelligence.

The record is clear that the court properly considered the appropriate sentencing goals of protecting the good order of society, deterrence, rehabilitation, and retribution. In fact, the court articulated these goals in its discussion at the sentencing hearing. Given the evidence presented, the court focused on the need to protect society and provide some sort of retribution and punishment due to the irrationality and harm presented by Kerrigan's behavior. The court observed that Kerrigan's antisocial personality disorder had been verified by Kerrigan's statements to the court. Kerrigan testified that he shot without thinking; he felt justified to an extent because he was scared of being caught in a stolen car; that it was in part the officer's fault because he appeared to have unclipped his gun from his holster; and Kerrigan seemed mostly unaffected by his actions. The court also felt that rehabilitation was not a good possibility considering Kerrigan's psychological make-up.

The record indicates that the court carefully considered the information presented and applied the proper sentencing standards. Given the nature of the offense and the character of the offender, we hold that the court did not abuse its discretion in arriving at its sentencing decision.

The judgment of conviction, including the sentence imposed, is affirmed.

SWANSTROM, J., and MOSS, J., pro tem., concur.